Yula P. St. George, as Administratrix of the Estate of Frank St. George, Deceased, Claimant, v. State of New York, Defendant. (Claim No. 30281.)

Court of Claims, January 28, 1953.

*Harry Ander* and *Harry H. Lipsig* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Edward R. Murphy* of counsel), for defendant.

SYLVESTER, J.   On March 1, 1950, one William Jones, then nineteen years of age, was discharged as " recovered " from the Matteawan State Hospital for the Criminal Insane.   On March 5, 1950, four days later, he brutally stabbed seven persons, none of whom he had ever seen before, of whom four were killed, including Frank St. George.   Charging negligence in the release of Jones from Matteawan, this claim is brought by the widow of St. George, as administratrix of his estate, to recover damages for his wrongful death.   Jones was admitted to Matteawan on December 23, 1948, having been committed to that institution from the New York State Vocational Institution at Coxsackie, New York, where he had been serving a three-year indeterminate sentence as a wayward minor, charged with assault and attempted robbery.   The reason for his commitment to Matteawan appears from the following summary of his mental condition which was made at Coxsackie on December 22, 1948, by the prison psychiatrist: " Began imagining his name was called and that the inmates were making fun of him.   Suspicious powder was blown at him.   Fought imagined persecutors and threatened to kill an inmate.   Change of behavior past three days; quiet, depressed, preoccupied.   Strange behavior.   Suspicious.   Thinks people regard him as going crazy."

The psychiatric report prepared at that time contained the following additional comment on Jones' condition:

" Diagnostic summary: Psychosis with psychopathic personality. Paranoid episode.

" Prognosis: Poor. Will likely recover from present paranoid episode although it cannot be said with certainty he may not become schizophrenic.

" Recommendations: Commitment to mental hospital. Too dangerous to others and self to maintain in New York State Vocational Institute at this time."

The Coxsackie records amply substantiated the dangerous nature of Jones' condition. On one occasion, he attacked another inmate and held him by the throat against the wall; on another, when he was refused a minor request, he slammed a window with such force as to break a pane of glass; he started a fight with another inmate because " he looked at me and I didn't like it "; he started still another fight because an inmate " gave him the evil eye "; he repeatedly threatened to kill other inmates; and on one occasion, he was found standing on the top of his bed by a guard, whereupon he got down and with a " wild stare in his eyes ", started to pace up and down, " swinging his arms wildly ".

It is significant, in the light of later events, that while at Coxsackie, Jones denied the delusions and hallucinations referred to in the report of the Coxsackie prison psychiatrist. On this subject, under the caption " Content of thought ", the following appears in the Coxsackie report: " Denies delusions and hallucinations. Admits singing low to himself so he won't be told to keep quiet. Denies ideas of persecution or 'evil eye '. * * * Someone was calling me names and I couldn't find out. Then this fellow started laughing and agitating me."

These evidences of psychosis are among the most common indicia of mental disorders accompanied by aggressive and violent behavior. The prison superintendent at Matteawan agreed that frequent assaults " motivated by delusional formation " would have a serious effect in the consideration of the discharge of an inmate. It has been said that " Crimes of violence have followed the taunts, the insults, and the threats of the hallucinations of hearing, and one sees in the asylums all kinds of emotional and volitional responses to hallucinations, from cringing fear to desperate anger, from loud and obscene replies to the most belligerent conduct." (Abraham Myerson on The Psychology of Mental Disorders [1927 ed.], p. 19.) The " evil eye " is particularly common. " The idea of persecution, of hostility on the part of one's fellows, either in organized

groups or as unorganized individuals, appears most conspicu-
ously. In its lesser form, it is the delusion of reference —
people watch me and talk about me, sneer and laugh at me,
slander and revile me." (Myerson, p. 23.)

Upon his admission to Matteawan, Jones sought to minimize
the difficulties that he had had at Coxsackie, but still persisted
in his belief that at night, while in his cell at Coxsackie, he
could hear his name called; and he insisted that all the inmates
in his division, about forty-two of them, were mixed up in this
name-calling, and that they were trying to excite him so that
he would be "bugged" (i.e., make him crazy).

His behavior at Matteawan continued to be characterized by
violence and aggression. In December, 1948, shortly after his
arrival at Matteawan, he was confined to camisole for assaulting
an attendant; on January 7, 1949, he was "threatening"; on
January 14, 1949, he accused officials of stealing his underwear
and a pen and pencil set; on March 3d, he assaulted an inmate;
on March 25th and again on April 12th, he was confined to
camisole for fighting.

No contemporaneous record was made as to the specific
circumstances surrounding each of these assaults or instances
of disturbed behavior or as to their motivation, though the
prison superintendent and head psychiatrist frankly admitted
that assaultive behavior must be carefully investigated and
analyzed to determine whether it is the result "of a delusional
formation" which would indicate a condition of dementia prae-
cox or schizophrenia, as modern psychiatry prefers to denomi-
nate this condition. It is to be kept in mind that Jones was
subsequently released precisely because it was determined that
his assaultive and disturbed behavior was not "of a delusional
nature". Yet, many of the assaults which have been referred
to were not described as to their character or motivation in the
patient's case history. This record is admittedly of funda-
mental importance in the evaluation of his condition. There
was ample psychiatric evidence that a proper evaluation of a
patient's mental condition requires that there be available to
the psychiatrist a complete record of the patient's prior history
and background, including, more importantly, incidents of
assaultive or disturbed behavior. As Dr. Bleuler points out,
in his Textbook on Psychiatry: "Nowhere as much as in
schizophrenia are all individual symptoms to be evaluated in
terms of their entire psychic environment." (P. 438.) Curiously
enough, the only entries made at Matteawan concerning Jones'

assaultive behavior were, with few exceptions, made by attendants in a record referred to as the " ward book " which was not customarily examined by the prison psychiatrists and which was not available to the psychiatrists at staff meetings when the patient was presented for diagnosis. For example, on April 20, 1949, Jones was interviewed by one of the prison psychiatrists who was primarily engaged in administrative work. Based merely upon this interview and a conversation which he had with the attendants, the diagnosis then arrived at was: " The long anti-social history beginning at an early age, without evidence of mental deficiency or organic pathology, would suggest a psychopathic personality. The alleged hallucinatory experience has been too brief and too limited to assume a schizophrenic basis. It might have merely been misinterpretation and could also have been actual experience. Although he shows a personality make-up which might later develop into a malignant paranoid reaction, the present findings would seem merely to indicate episodes of emotional instability in a psychopathic personality and the diagnosis offered for consideration is psychosis with Psychopathic Personality, Episodes of Emotional Instability." This diagnosis was approved at a staff meeting held on May 12, 1949. At this meeting, the ward book entries referring to the specific assaults and acts of violence which Jones had committed were not submitted to the physicians. They relied entirely upon the presentation made by the administrative psychiatrist who had interviewed Jones on April 20th and upon the questioning then conducted of Jones who was present at the meeting.

Between May and August, 1949, Jones was confined to camisole on at least four separate occasions for fighting or for assaultive behavior. The psychiatrist who had Jones in charge at this time, could not have been familiar with these incidents, since on August 9, 1949, he included the following memorandum in the patient's case history: " Since last noted the patient has been pleasant and agreeable with one exception." The exception referred to in the memorandum, moreover, related to an incident which is not reflected in the ward book. Upon the trial, this psychiatrist, confronted by the entries in the ward book, admitted that his memorandum was in error. He said as to this: " Apparently I have an error here " which he agreed " was carelessly made ". On August 30, 1949, Jones was again presented at a staff meeting and was pronounced recovered. This finding, at least in part, was based upon the concededly erroneous case history.

The prison psychiatrists sought to support their finding of recovery on August 30th by testimony that some of the assaults committed by Jones were, in fact, investigated and were found not to be " motivated by delusional thinking ". This testimony, however, was not convincing. The prison psychiatrist who was in charge of Jones at this time testified that Jones " might " have been assaultive because " someone may have called him a name or someone may have been teasing him ". What might have happened is, of course, pure speculation. Good caution would seem to have required a more serious appraisement of the circumstance in view of a history punctuated by assaults and disturbed behavior.

Even when a specific assault by Jones was investigated, it appears that no diligent effort was made to probe into its motivation. On June 10, 1948, the " charge attendant " reported to Dr. Proctor that Jones stabbed another patient on the arm with a mechanical pencil. Jones complained that the other patient " would not let him alone ". The psychiatrist testified that he could get no information from the other patient and that was the end of the investigation. Moreover, no reference whatsoever was made to this significant incident in the patient's case history. On September 13, 1949, Jones was transferred to another ward under the care of a different psychiatrist. Strangely enough, this psychiatrist did not even read Jones' case history until November 17, 1949, more than two months after Jones was transferred to his care. On at least six occasions in October, 1949, entries were made in the ward book reflecting that Jones was disturbed and that on at least one occasion he had to be placed in seclusion because he committed an assault on another inmate. The psychiatrist in charge insisted that he had investigated this assault but nevertheless admitted that his investigation did not include an examination of Jones' case history, a procedure which should have been followed as testified to by a State expert, who said that in investigating an assault, he would first examine into the inmate's hospital history and study his record. On November 17, 1949, this psychiatrist found that Jones " had been working in a satisfactory manner in the dormitory and has been sociable and cooperative on the ward ". No mention or reference was recorded concerning Jones' assaultive behavior in October. On November 27, 1949, Jones committed an assault on an inmate in the washroom. The psychiatrist in charge testified that he was " probably " told about this incident but " it made no

impression on him." The ward book indicates that Jones was "disturbed" on ten successive days between January 6th and January 15, 1950. On January 18th, he was "assaultive" and put in seclusion; on January 19th, he was placed in seclusion as being "assaultive and disturbed"; on January 20th, he committed an assault on another inmate and was put in seclusion; on January 21st, he was put in seclusion as being "disturbed". On January 22d, he was again put in seclusion. Despite these ward book entries, a memorandum prepared on January 21st by the psychiatrist in charge of his ward and included in the case history, stated: "He has been sociable with other patients and has carried out the orders of the attendants."

Upon the trial, the prison psychiatrist in charge of Jones, confronted by the ward book entries, admitted that during the month of January, Jones was one of the three most "disturbed" patients in his ward and the most "assaultive".

The inference is inescapable from the record that the prison psychiatrists were never actually aware of the extent and nature of Jones' assaultive and disturbed behavior and that consequently, no substantial effort was made at any time to ascertain delusional motivation for his assaultive conduct. A psychiatrist called by the State testified to the importance of entering in the case record every indication of abnormal behavior. But at Matteawan, the question as to whether a particular act of misbehavior should be entered was left to the discretion of a lay attendant, so that it was conceded that not every assault or disturbance was actually entered even in the ward books. And, admittedly, the entries which were made were not always examined by the psychiatrists in charge.

A State expert unequivocally emphasized the fundamental importance of diligently investigating every assault, whether or not delusionally motivated. He stressed the necessity of a regular examination of the ward books particularly when the patient's release was being considered, at which time these ward books, with their detailed entries relating to the patients' behavior, should definitely be available.

The reason for this inattention and neglect is at hand. Provision was made at Matteawan for ten psychiatrists, including the prison superintendent. Of these positions, four were vacant. Furthermore, between December, 1948, and March 1, 1950, the population of the institution ranged from 1,650 to 1,700, when the capacity of the institution was 1,423. According to the

testimony of the superintendent of the prison, two psychiatrists were doing the work of six. " The doctors were over-worked and the institution was under-staffed." It was his opinion that at least two and possibly three psychiatrists should have been assigned to the 500 patients who were under the care of the single psychiatrist who was in charge of Jones. One of the psychiatrists, admitting that he did not look at the ward books, said " he did not have the time to do it."

It was the opinion of experts called by the State, that every conceivable psychiatric precaution was taken in the release of Jones. Claimant's psychiatrists, on the other hand, testified that no diagnosis other than schizophrenia could have been made upon the basis of the records and that Jones should not have been released.

There was, in this case, psychiatric evidence that if delusions cannot be elicited even upon thorough investigation, a constant pattern of assaults is significant, particularly where the patient is the aggressor. This would signify that the patient is laboring from a delusion which is deep rooted and which he is concealing. " Even patients who are almost incessantly occupied with their hallucinations and are influenced by them, consequently cannot even with the best of intentions give any account of them when they are questioned about them ". (Bleuler, Textbook on Psychiatry, pp. 389, 390.)

It is true that there were periods of time at Matteawan during which Jones was comparatively well behaved. But there was ample psychiatric evidence that remissions must not be confused with recovery, particularly where a period of good behavior is followed by further outbreaks of violence and aggression. As is pointed out in Jelliffe and White on Diseases of the Nervous System (4th ed., 1923, ch. XIX): " Remissions are quite the rule * * *. Often patients get along very well in an institution, but become upset shortly after going back to the conditions under which the conflict developed ". (P. 999.) Here, as has been noted, brief periods of remission were followed by further outbreaks of violence. A psychiatrist, called by the State, candidly admitted that if Jones were in fact disturbed day after day, and engaged in assaults as the aggressor, " he would be glad to change the testimony " which he had given to the effect that every psychiatric precaution had been taken in releasing Jones.

The evidence in this case clearly establishes that Jones was disturbed and assaultive on numerous occasions throughout his

stay at Matteawan; that many of these incidents were not entered in the ward book; that even those incidents which were entered in the ward book were not examined by the psychiatrist in charge, and were not reflected in the patient's case history; that the determination made on August 30, 1949, that Jones was recovered, was based at least in part upon a concededly erroneous case history; that no substantial effort was ever made at any time to inquire into the motivation for the assaultive behavior of Jones; that admittedly, if Jones' assaultive and disturbed behavior was characterized by delusions, he would have been found psychotic and would not have been released; that the pattern of behavior shown by Jones throughout his stay at Matteawan was strikingly similar to that revealed at Coxsackie, upon the basis of which Jones had been committed to Matteawan as being too dangerous to himself and to the other inmates to be kept even at a prison institution; and that the psychiatrists who determined that Jones could be released never had the opportunity or the facilities to properly inquire into Jones' mental condition in order properly to evaluate his condition.

It was admitted by the superintendent of Matteawan that the diagnosis ultimately arrived at was erroneous and should have been " schizophrenia " of the paranoid type. He claims that the mistake could not have been avoided. The record proves the contrary. Had there been adequate facilities, had two psychiatrists not been doing the work of six, had entries been made in the ward books of each assault and incident of disturbed behavior, had the ward books been presented at staff meetings and had the psychiatrist in charge had the time and opportunity to investigate each incident of assault and disturbed behavior, the existence of delusions and hallucinations would have been ascertained and it is reasonable to believe that Jones' condition would then have been diagnosed either as psychosis with psychopathic personality or as schizophrenia, and in either event Jones would not have been released.

The deplorable condition of overcrowding and understaffing that prevailed at the institution makes it obvious from all the evidence that the institution's psychiatrists were simply unable to adequately administer their responsibilities and make sound clinical judgments due to the indicated handicaps. Thus, there was a failure of proper supervision and care by reason of the fact that the institution's psychiatrists were not afforded a reasonable opportunity to keep themselves informed of the

true condition of Jones; and that they in fact failed and omitted to· exercise the usual and approved techniques and procedures of the psychiatric therapist in the care and treatment of Jones and in determining the propriety of his discharge, all of which ultimated in the negligent discharge of Jones and the killing of the decedent.

The public is entitled to protection against dangerous psychotics. The State, having assumed to care for and treat a mental incompetent confined to its care on the basis of a psychiatric finding that he was too dangerous to himself and to others to be maintained even in a penal institution, was obliged to exercise a reasonable degree of care and attention in the proper treatment and psychiatric evaluation of the patient.

In *Flaherty* v. *State of New York* (296 N. Y. 342) it was said, per FULD, J., at page 346: '' The law is clear; it is only in its application that difficulty is encountered. The State — just as any other party (Court of Claims Act, § 8; L. 1939, ch. 860) — is responsible, in the operation and management of its schools, hospitals and other institutions, only for hazards reasonably to be foreseen, only for risks reasonably to be perceived. (See *Excelsior Ins. Co. of N. Y.* v. *State of New York* [296 N. Y. 40], *supra; Galabria* v. *State of New York,* 289 N. Y. 613; *Martindale* v. *State of New York,* 269 N. Y. 554; *Palsgraf* v. *Long Island R. R. Co.,* 248 N. Y. 339, 344.) ''

Although the court found no liability upon the facts there presented, it is relevant to set forth its characterization of the decision reached in *Scolavino* v. *State of New York* (297 N. Y. 460): '' A contrast most apt is furnished by *Scolavino* v. *State of New York* (297 N. Y. 460), which we also decide today. In that case, a vicious assault by one inmate of a mental hospital upon another was — against the background of the institution's experience — reasonably to be foreseen. The duty being thus defined, the failure to take the precautions dictated by reason rendered the State liable for the resulting injury.'' (P. 347.)

The overcrowding of State institutions and the inadequacy of supervisory personnel have frequently been held to establish negligence against the State (*Martindale* v. *State of New York,* 269 N. Y. 554; *Curley* v. *State of New York,* 148 Misc. 336, affd. *sub nom. Luke* v. *State of New York,* 253 App. Div. 783; *Rossing* v. *State of New York,* 47 N. Y. S. 2d 262; *Dow* v. *State of New York,* 183 Misc. 674; *Tabor* v. *State of New York,* 186 Misc. 736). In this case, the State had ample warning of Jones' predisposition to violence. The duty of the State being thus

clearly defined, its failure to institute and carry out the procedure dictated by accepted psychiatric practice rendered the State liable for the resulting injury.

There remains the assessment of damages. The elements to be considered are the age of the decedent, his health, habits, qualities, expectation of life and expectation in life, earning ability, income, the prospect of increase of income and the number and condition of those depending upon him for support and his disposition to support them well or otherwise (*Arnold* v. *State of New York,* 163 App. Div. 253, 264; *Liubowsky* v. *State of New York,* 260 App. Div. 416, affd. 285 N. Y. 701; *Neddo* v. *State of New York,* 194 Misc. 379, affd. 275 App. Div. 492, affd. 300 N. Y. 533; Decedent Estate Law, § 132).

The decedent was forty-six years of age on the date of his death. He was survived by his widow, who was then fifty-four and a son, nineteen years of age. He had been employed in the fitting room of R. H. Macy & Company since August, 1932, his compensation having risen gradually until in 1949 his earnings were $4,844. He lived with his family in a small home which had been purchased out of his earnings. They also had a summer cottage in Port Jefferson and a new automobile which the deceased had purchased a few weeks before his death. The widow testified that her husband was in good health; that he was " a very home man " and that he was a devoted father to their son, who was attending St. Johns College where he was working for a degree of bachelor of science.

Judgment is directed in favor of the claimant in the sum of $40,000, together with the sum of $712 representing the funeral expenses, making a total of $40,712, together with interest thereon from March 5, 1950, to the date of entry of judgment herein. The foregoing constitutes the written and signed decision upon which judgment may be entered (Civ. Prac. Act. § 440).