FRANK SCHWENK, as Administrator of the Estate of HERBERT W. SCHWENK, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30624.)

Court of Claims, December 12, 1953.

*Jerome Golenbock* for claimant.

*Nathaniel L. Goldstein, Attorney-General (David Marcus* of counsel), for defendant.

LAMBIASE, J. On May 26, 1950, one Robert Cannon, a patient on convalescent status from Pilgrim State Hospital, a hospital owned and operated by the State of New York for the care and treatment of the mentally ill of the State, was riding in a bus in the County of Nassau, New York. He was seated behind claimant's intestate, Herbert W. Schwenk, who was accompanied by his fiancee. Concededly neither of them knew Robert Cannon. There came a time when the intestate and his fiancée alighted from the bus, said Robert Cannon getting off the bus immediately behind them. As the intestate, Herbert W. Schwenk, and his fiancée reached the sidewalk, Robert Cannon fatally stabbed the intestate. Following the death of the intestate, Cannon was arrested and was charged with and later indicted for murder in the first degree. On September 19, 1950, the County Court of the County of Nassau, New York, ordered that Cannon be examined by two qualified psychiatrists to determine his sanity. The psychiatrists on November 27, 1950, submitted their report, findings, and conclusions as a result of which on December 14, 1950, the Nassau County Court ordered: " that the findings and conclusions of the psychiatrists aforementioned dated November 27th, 1950, that the above named defendant, Robert Cannon is presently insane, be, and the same hereby are, confirmed and the defendant committed to the Matteawan State Hospital at Beacon, Dutchess County, New York, until he shall become sane, when he shall be returned to this Court for disposition of the indictment pending against him ".

The administrator has filed this claim alleging that: " 3. The claim is for negligence of the State of New York in that it released from the Pilgrim State Mental Hospital, Brentwood, New York, one who was in such a mental state as to be a menace to persons around him and particularly to claimant's intestate; in failing to adequately supervise and exercise due care under the circumstances so as to prevent the release of mental patients who are incompetent and prone to physical violence; in failing to exercise every reasonable care and caution in the release of mental patients to determine whether it was safe for said mental patients to be released; in releasing one Robert Cannon,

a mental patient, with knowledge of his dangerous propensities to assault and do bodily harm to other persons and otherwise failing to exercise reasonable care and caution to prevent the happening of the accident herein."; and alleging that: " 8. That the accident was caused by the negligence of the State of New York, without fault or contributory negligence on the part of the claimant's intestate."

The claim of the claimant herein has been duly filed, has not been assigned, and has not been submitted to any other officer or tribunal for audit or determination.

It is the contention of claimant that, at the time of Cannon's release on convalescent status from Pilgrim State Hospital on October 2, 1949, Cannon was mentally ill, viz.: that his personality make-up was basically paranoid, and that the effect upon him of excessive intake of alcohol released and made actively apparent the paranoia which he was able to repress when not under such alcoholic influence; that Cannon had a psychosis, and that the drinking was secondary; that the history or anamnesis as taken at the hospital was incomplete and insufficient in that it did not set forth the entire record of Cannon's arrests, commission and conviction of crimes and particularly those of an assaultive nature, and in that the particulars and details of those crimes which were in his hospital record were not ascertained by the hospital and were not set forth therein; that Cannon's release on convalescent status was not in conformity with standard psychiatric practice and standard psychiatric institution practice, all of which claimant contends constitutes negligence on the part of the State of New York. Claimant contends further that the so-called " follow-up " of Cannon while on convalescent status was not in conformity with standard psychiatric practice and standard psychiatric institution practice and procedure, and also constitutes negligence on the part of the State of New York; and claimant asserts that he has established the foregoing.

On the other hand, the State of New York asserts that at the time of Cannon's release on convalescent status he was and had been for several months prior thereto completely free from his mental condition which had been diagnosed as " psychosis due to alcohol paranoid type ", that actually Cannon was cured of his psychosis long before he was released on convalescent status, and that the hospital could no longer legally hold him in the hospital beyond the date of his release on convalescent care because of that fact; that as a matter of fact Cannon's being

put on convalescent status was just another added precaution beyond that which was actually called for by his mental condition at the time of his release on said convalescent care; that the compiling and the preparing of Cannon's history or anamnesis at the hospital and of his hospital records were in accordance with standard psychiatric practice and standard psychiatric institution practice and procedure; and, lastly, that Cannon's release on convalescent status was also in accordance with said practice and procedure; and the State maintains that it has established the foregoing.

Robert Cannon's difficulties began some years before the tragedy which is the subject matter of this litigation. As early as June 17, 1942, he had been hospitalized in Meadowbrook Hospital, County of Nassau, New York, from which he was discharged on June 19, 1942, with a final diagnosis of "Acute exacerbation of chronic alcoholism". On June 7, 1946, he was again hospitalized in said hospital, was assigned to the "Psycho" ward and was discharged therefrom June 9, 1946, with a final diagnosis of "Chronic Alcoholism. ? early schizophrenia". On May 12, 1949, he was again brought to said hospital and from there was admitted to Pilgrim State Hospital on May 18, 1949, upon a court order of certification obtained upon petition of his son. On June 2, 1949, it is noted in said hospital's "Clinical Notes" that "This patient has made an excellent ward adjustment". On June 14, 1949, said notes set forth, among other things, the same finding; and on June 16, 1949, they contain the following: *"Mental Diagnosis:* Psychosis due to alcohol, paranoid type." Additional entries appear in the "Clinical Notes" showing that convalescent care was approved for Cannon on September 19, 1949, his then condition of mental health being noted as "Much Improved"; and under date of October 2, 1949, there appears in said notes the following: "Released on convalescent care. Patient was today released to the custody of his son, Leroy Cannon, 49 Plainfield Avenue, Elmont, N. Y. for a period of one year. First clinic appointment was made for November 23, 1949 at 1:30 p.m. at the Pilgrim State Hospital Mental Clinic, Psychiatric Institute, 722 W. 168th Street, New York City. Condition: Much Improved."

Cannon reported at the clinic on November 23, 1949, and an entry in the "Convalescent Care Notes" under that date made by the supervising psychiatrist sets up, among other observations, the following: "Satisfactory adjustment.

\* \* \* States he has abstained from alcohol. Will report February 1." The same notes show that on February 1, 1950, Cannon again reported at the clinic under which date it is written in said notes: " Denies use of alcohol. \* \* \* will report June 7 ".

As part of the hospital's " follow-up " while Cannon was on convalescent care, visits to his home were made by a social worker from the hospital in the months of November and December, 1949, and of January, February, March, April and May, 1950. However, the social worker, who was a woman, never saw or talked with Cannon on any of these occasions. She did, however, receive good reports of him from the people with whom he was then residing, and the hospital record " Convalescent Care Notes " detail her visits and her observations made as a result thereof. Throughout these notes of the visits of the Social Worker, " Favorable Adjustment " on Cannon's part is noted. The social worker was part of a psychiatric team which was under the direction of a supervising psychiatrist, and the contents of said notes were known or should have been known to him. The fatality of May 26, 1950, intervened before Cannon's scheduled June 7, 1950, clinic interview.

It is urged that Cannon's history as obtained by the hospital was incomplete and insufficient and not in conformity with standard psychiatric practice and standard psychiatric institution practice and procedure for the reasons hereinbefore set forth. Concededly the history and hospital records of Cannon did not contain the complete details of Cannon's criminal episodes; some details thereof not contained herein were established upon the trial. Notwithstanding that fact, the records at the Pilgrim State Hospital indicate that as early as the date of admission, May 18, 1949, Cannon had demonstrated psychiatric signs and symptoms described therein as: " Destructive and assaultive, delusions of persecution." Apparently the State hospital psychiatrist had arrived at that conclusion upon what information they then had. The State's psychiatrists testified that the details of Cannon's criminal career, which they did not have at the time of his release and which were adduced by claimant upon the trial, would have added nothing to their evaluation of his mental condition, and particularly of his destructive and assaultive tendencies and of his delusions of persecution as already entered upon the hospital notes and in the hospital record. We agree with them that, at best, the additional information referred to would have but confirmed such evaluation

already made. We are of the opinion that claimant has failed to sustain his position on this particular phase of this litigation. .

The release of patients from hospitals such as the Pilgrim State Hospital on convalescent status is standard psychiatric practice and is standard psychiatric practice and procedure with such institutions. Dr. Hyman S. Barahal, a State psychiatrist, testified as to the practice and the reason therefor as follows: " We no longer refer to patients leaving a mental hospital as being on parole, we refer to them as being on convalescent care. We no longer use that procedure as a means of so-called checking up on patients analogous to parole boards of prisons in checking up on prisoners that have been released. The convalescent care program is solely for the purpose of seeing that the patient has the best possible chance of adjusting outside of the hospital. It is a therapeutic program. The patient may come and discuss his problem with the doctor at the clinic and he feels free to do that. It depends very much on the individual, too. The practice has been that and I think it is a practice which is agreed to by most psychiatric authorities, there is no value in forcing the patient to go to clinics because the minute you introduce force into psycho-therapy you have vitiated the very purpose for which you are using it; so that the convalescent care program is generally used as a means of the patient utilizing that particular means of being able to come to the doctor whenever he wishes to do so."

It is obvious that in the release of Cannon on convalescent care there was a risk involved which had to be considered and calculated. That calculated risk was the likelihood of his having drinking episodes while on convalescent status and away from the hospital where he had been free from the stress and strain of community life to which he was returned because of his release. There is ample evidence in the record that the psychiatrists at the Pilgrim State Hospital did consider such calculated risk prior to releasing him on convalescent care. Apparently in their judgment the calculated risk was justified in view of what they considered to be the condition of his mental health at the time.

It is urged that the " follow-up " of Cannon while on convalescent status by the Pilgrim State Hospital was not in accordance with standard psychiatric practice and with standard psychiatric institution practice and procedure. Taking the position that Cannon's release on convalescent status was not standard psychiatric practice and procedure, one, Dr. Ruth Fox,

a psychiatrist and witness for the claimant, in answer to hypothetical questions testified in part: '' I think if the person had been acting rationally it's all right to release him on parole; but that means a very careful parole. So I think something depends on what was done for the patient afterwards.'' And again: '' I can't help stressing the fact that I think a patient can be let out of a hospital on parole, but he still is subject to study and treatment.'' She further testified that the '' follow-up '' which was carried out with reference to Cannon was not standard psychiatric practice and procedure.

The State's position on this point was stated by Dr. Hyman S. Barahal, a State psychiatrist, who testified, among other things as follows: '' Some patients, depending on the valuation we make of them, if we feel that they would benefit by visiting the outpatient clinics and seeing the doctors voluntarily may be given the opportunity of going to the outpatient clinic; quite frequently some of them may be seen as often as once a week or once a month. Others we may not see at all at the clinic, for instance, if a patient says to us, doctor, I have a steady job that I have obtained and if I have to come to the clinic it would mean giving up my job or perhaps losing my job, and if in our opinion the patient would not benefit by visiting the clinic we don't insist on it. * * * A. The social worker works as part of a team; we generally speak of a team in psychiatry. The social worker cooperates with the psychiatrist in helping the patient adjust on the outside. Q. Now, doctor, with respect to Robert Cannon, what was the function of the social worker here? A. The social worker had actually no great function because when Cannon was released he was considered recovered from his mental illness. In his particular case it was not felt that he required constant supervision.''

The liability of the State of New York must be determined by what was done or not done by the psychiatrists and personnel at Pilgrim State Hospital with reference to the diagnosis and treatment of Cannon's mental condition and with reference to his release on convalescent status and the subsequent '' follow-up '', for such psychiatrists and personnel were all employees of the State of New York acting within the scope of their employment at the hospital and bound the State of New York by the psychiatric practice and procedure which they employed. The question, therefore, it would seem resolves itself into this: Has the claimant established that these employees of the State of New York did not act in conformity with standard psychia-

tric practice; and that the hospital, through them, did not act, in Cannon's case, in accordance with standard psychiatric institution practice and procedure in the matters of the obtaining of his history, his treatment and care while in the hospital, his release on convalescent care, and the " follow-up " subsequent to said release on convalescent care.

We are of the opinion that claimant has failed to establish that the psychiatric practice and procedure employed in Cannon's case by the State's psychiatrists and its personnel and through them by Pilgrim State Hospital as to the matters immediately above set forth were not standard and approved. Particularly, claimant has not shown that the State's psychiatrists who were in charge of Cannon's case did not possess that reasonable degree of learning and skill that is ordinarily possessed by psychiatrists in the locality in which they were practicing and which is ordinarily regarded by those conversant with such employment as necessary to qualify them to engage in the practice of psychiatry; nor has it been shown that the State psychiatrists did not meet their duty to use reasonable care and dilligence in the exercise of their skill and in the application of their learning to accomplish the purpose for which they were employed in Cannon's case; nor does it appear that they failed to use their best judgment in exercising their skill and in applying their knowledge. In short, the law holds a physician liable for an injury to a patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment. The rule requiring him to use his best judgment does not hold him liable for a mere error of judgment provided he does what he thinks is best after careful examination. (*Carpenter* v. *Blake,* 75 N. Y. 12; *Link* v. *Sheldon,* 136 N. Y. 1; *Pike* v. *Honsinger,* 155 N. Y. 201; *Kinsley* v. *Carravetta,* 244 App. Div. 213, affd. 273 N. Y. 559.)

Assuming *arguendo,* and for that purpose only, that the diagnosis of Cannon's mental condition by the State's psychiatrists was incorrect, that he should not have been released on convalescent care at the time that he was, and that the " follow-up " program was not adequate, upon this record there would be shown thereby only errors of judgment on the part of the State's psychiatrists and on the part of Pilgrim State Hospital, for which errors of judgment the State of New York cannot be held to answer the claimant in damages, no matter how grievous they may be. Stark as is the tragedy which has been

visited upon the intestate and his family, such circumstance alone, without responsibility being established, cannot justify the imposition of liability against the State.

It is concluded, therefore, that claimant has failed to establish a cause of action against the State of New York. In view of such conclusion we do not reach the question of damages.

We believe that our determination herein has significance beyond the issue of whether or not a money recovery should be allowed, because of its import in connection with the problem, ever present in cases of this kind, of achieving a balance between contending interests — (1) the State's duty to treat and care for its mentally ill wards, with an eye toward returning them to society more useful citizens; and (2) the State's concern that such wards cause no injury to persons or damage to property around them. (*Excelsior Ins. Co. of N. Y.* v. *State of New York,* 296 N. Y. 40, 46.)

The tragic circumstances disclosed by the record point up the necessity for setting up preventive and adequate legal procedures to deal with cases of this type, so productive of disaster. That, however, is the function of the Legislature and not of the courts. However, the nature of the problem involved should invite its consideration by all and particularly by those who are qualified by knowledge, training, and experience to understand it best.

The claim must be and hereby is dismissed upon the merits.

The foregoing constitutes our written and signed decision. (Civ. Prac. Act, § 440.)

Let judgment be entered accordingly.