Francis A. FAHEY and Josephine Fahey, as Administrators of the Goods, Chattels and Credits which were of Eileen Fahey, Plaintiffs,

v.

UNITED STATES of America, Defendant.

United States District Court
S. D. New York.

July 26, 1957.

O'Dwyer & Bernstein, New York City, for plaintiffs. Paul O'Dwyer and Howard N. Meyer, New York City, of counsel.

Paul W. Williams, U. S. Atty. for the S. D. of New York, New York City, for defendant. Morton S. Robson and John S. Clark, Asst. U. S. Attys., New York City, of counsel.

LEVET, District Judge.

This action, tried by this court without a jury, was brought under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2671 et seq. The plaintiffs' intestate, Eileen Fahey, a young woman of some 18 years, was shot and killed on July 14, 1952, by one Bayard P. Peakes, a demented war veteran. As a result of this tragic death, the administrators have sued the United States of America on the ground that its alleged negligence in permitting Peakes to be at large permitted the happening of the unfortunate occurrence.

The case, having come on for trial upon the pleadings and proofs of the parties, was submitted to the court for decision upon briefs and argument of counsel. After due deliberation, the court now makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. Bayard P. Peakes a former member of the Armed Forces (born December 14, 1922, a citizen of the United States) was in the Royal Canadian Air Force for 1½ years and was transferred to the American Army in October, 1944. He was admitted to an Army hospital on or about March 12, 1945. There was no history as to the immediate cause of this hospitalization. He was said to be tense and anxious, severely retarded and had marked guilt feelings about his preoccupation in the sexual sphere. He was reported to be difficult to manage and was frequently noted to behave as if he were actively hallucinating. He was classified as dementia praecox, unqualified. Insulin shock treatment was recommended and thereafter administered.

2. On a Rating Sheet issued by the Regional Office of the Veterans Administration, Area No. 1, Boston, Massachusetts, under date of September 14, 1945, at or about the times of Peakes' discharge, he was rated at 50% disability; psychosis, unclassified, in part remission, competent. It was stated that his condition was in the nature of constitutional or developmental abnormalty; not a disability within the meaning of Title I, Public 2, 73rd Congress, WW II, Reg. 1(a), Part I, Par. 1(a); no combat disability. Peakes' permanent place of residence, according to the records of the Veterans Administration, was at Dover-Foxcroft, Maine. He never married.

3. On August 24, 1948, a Rehabilitation Board reported to the Adjudication Officer that Peakes had a 50% psychosis disability; that he had studied for two years at Northeastern University and that further study was deemed nonfeasible by Newman Cohen, M.D., the Board's psychiatric consultant. The Board concluded that medically Peakes was not feasible for such training and that a checkup was to be made in December, 1948. Dr. Cohen's report dated August 19, 1948 reads in part as follows:

"It is felt that it would be unwise to subject this fragile personality with all his psychotic residuals to the stress inherent in his planned objective. The malignant schizophrenic process has been only arrested and there is serious question as to how long or to what degree an achievement he will be able to make. In any event caution is necessary. The prognosis is fraught with danger. The picture is a bleak one and he does not appear to be feasible at this time to undertake a vocational training program."

4. On December 14, 1948, Dr. Newman Cohen reported, among other things, that Peakes' acute psychotic manifestations were in abeyance and that he must be considered a schzoid personality, a latent schizophrenic with marked potentialities for relapse and that there was a serious question as to how long Peakes would be able to carry on his educational program. However, Peakes was reported feasible for vocational training on a trial basis although interruption in the training might be frustrating.

5. On October 5, 1949, Peakes was medically examined by the Veterans Administration, his history was noted, including the fact that, from 1946, under the G. I. Bill, he had attended Northeastern University, studying biology as a major student; that he had gotten along very well the first year, but the second year he did not do so well; that he had been placed on a so-called "cooperative plan"—a period of outside work and then a period of study, alternately with a vacation; that he was working in the Boston State Hospital as an attendant and that at times he attended movies and dances. Peakes admitted having hallucinations and hearing voices. The diagnosis was "Schizophrenia, in partial remission * * * He is competent." The examiner stated that Peakes should be advised against continuing his present educational course because it did not seem possible that he could complete it.

6. On July 5, 1950, Peakes wrote a letter to Dr. Cohen, in which he expressed peculiar ideas in reference to certain physical difficulties of which he complained, and stated, among other things, that he had quit school and was concentrating on a study of medicine. He said: "I expect to get someone besides Mr. Filene to help me abolish the electron theory and start a search for a medicine to keep man young." This letter was forwarded to the Adjudication Division of the Veterans Administration.

7. On July 24, 1950, Peakes wrote another letter to the Veterans Administration regarding his application for a 100% disability. He said: "I still expect to disprove the electron theory, get a political party started, and do some research in medicine. Some day I shall be able to put a few females to work at manual labor, so they might grow some brains. If I don't find the eternal life, their children will." This letter was acknowledged on August 9, 1950, by S. R. Bacherman, Adjudication Officer of the Boston Regional Office. On October 5, 1950, the Veterans Administration examined Peakes in connection with his appeal for 100% disability.

8. Peakes was also examined on October 26, 1950. The psychiatric report, signed by Dr. Carl J. Hedin, Psychiatrist, stated, among other things:

"Veteran is oriented in all spheres. He has good grasp of school and general knowledge. He states that he has no worries. His immediate plans are to stay at home and read medical books in order to live longer. By reading medical books he hopes to discover how to live so that he will live longer. He states he has disproved the electronic theory and a few members of the American Society of Physicists are backing him. Veteran states he has written one book entitled, 'Practical Explanation of Science.' [etc.]"

The diagnosis was "Schizophrenic reaction, paranoid type, in partial remission." Dr. Hedin said that in his opinion the veteran "is not mentally competent to look after his personal affairs."

The Rating Sheet dated November 28, 1950, signed by R. W. Wilson, M.D., Rating Specialist (Medical), J. J. Jackson, Rating Specialist (Claims), and S. Crasnick, Chairman, Rating Specialist (Occupational), concluded that there was a "schizophrenic reaction, paranoid type, formerly diagnosed psychosis, mixed type;" that the veteran was declared incompetent from October 26, 1950.

9. On December 5, 1950, the Adjudication Officer of the Veterans Administration at Togus, Maine, wrote to the Chief Attorney of the Veterans Administration with respect to Peakes:

"In the following case [Bayard P. Peakes] payments of Disability compensation are payable to a person mentally incompetent and it is requested that the appointment of a fiduciary or the recognition of a legal custodian be accomplished as promptly as possible."

10. On or about December 5, 1950, the Adjudication Officer of the Veterans Administration notified Mrs. Barbara G. Peakes, mother of Bayard P. Peakes, that her son's service disability had been raised to 70% as of July 27, 1950, entitling him to compensation at the rate of $105 per month, but that the payments, including retroactive payments which had been retained, would have to be made through her.

11. On or about March 6, 1951, the Probate Court in and for the County of Piscataquis, State of Maine, adjudged Bayard P. Peakes to be incompetent and appointed his mother, Barbara G. Peakes, with whom he made his permanent residence, to be his guardian. The Letters of Guardianship were dated March 15, 1951. On or about March 23, 1951, the Adjudication Officer of the Veterans Administration wrote to Mrs. Peakes advising her that her son was considered to be 70% disabled; that he would receive certain compensation payable monthly and that the appeal for 100% disability evaluation would be continued.

12. Prior to 1952, Peakes wrote a monograph purporting, among other things, to disprove the existence of electrons. He sent a copy of it to the Veterans Administration, which denied that Peakes made known to it his interest in having it accepted. Peakes also submitted a copy of his monograph to the American Physical Society at Columbia University, New York City, for its approval and support. The Society rejected his theory.

13. On July 14, 1952, at about 9:30 A.M., Peakes entered the office of the American Physical Society and killed Eileen Fahey who at that time was in the employ of the Society and at work in the course of her employment.

14. Three days after the shooting of Eileen Fahey, Peakes was taken into custody and brought to New York City. On July 18, 1952, he was committed to Bellevue Hospital. On July 23, 1952, he was indicted for murder in the first degree and on July 28, 1952, his attorneys filed a plea of not guilty by reason of insanity. After hearings by a Lunacy Commission at Bellevue on August 11, 1952, he was found to be incapable, by want of reason, to stand trial, and on August 18, 1952, he was committed as a criminally insane person to the Matteawan State Hospital in New York State.

15. On August 5, 1952, the Surrogate's Court of New York County, State of New York, issued Limited Letters of Administration to the plaintiffs, Francis A. Fahey and Josephine Fahey, on the estate of Eileen Fahey.

16. Plaintiffs' intestate, Eileen Fahey, was 18½ years old at the time of her death. She was unmarried, resided at home, and earned some $210 per month gross. She contributed $30 twice monthly to the home for board. She paid the monthly telephone bill of $7 or $8, and she contributed certain sums for clothes for her mentally-defective brother, Stephen. She also contributed about $50 yearly to the payment of Stephen's medical expenses. The funeral bill for Eileen Fahey was $1,122.40.

17. The evidence in this case does not establish plaintiffs' contention that the defendant was culpably negligent since it does not appear from the facts and circumstances that the defendant acted unreasonably in discharging Peakes from service in 1945, or that thereafter the defendant acted unreasonably in failing to cause Peakes to be committed to an institution.

### Discussion

By notice of motion dated January 25, 1954, the defendant moved for an order pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, 28 U.S. C.A., dismissing the complaint herein on the ground that it failed to state a claim upon which relief can be granted, in that

plaintiffs' claim arose out of an assault and was excepted from the Federal Tort Claims Act pursuant to the provisions of Title 28 U.S.C.A. § 2680(h). The motion also asked for such other and further relief as the court may deem just and proper. This motion was granted and a judgment was entered on March 12, 1954, dismissing the complaint. On appeal, however, the judgment of the district court was reversed upon the authority of Panella v. United States, 2 Cir., 1954, 216 F.2d 622. (See Fahey v. United States, 2 Cir., 1955, 219 F.2d 445.) In the Panella case, supra, it was held that

a Federal Health Service Hospital inmate who was stabbed by another inmate was not barred by the exception in the Tort Claims Act with respect to claims based upon negligence and arising out of an assault or battery because this exception precludes recovery only when the assault or battery is inflicted by a government employee.

Certain of the basic statutes concerning the Veterans Administration which are applicable here are set forth in the margin.[1]

The regulations involved are also set out in the margin.[2]

1. Title 38 U.S.C.A. § 11. "Establishment of Veterans' Administration; transfer of duties, powers, and functions of hospitals, bureaus, agencies, and offices relating to veterans

"(a) The President is authorized by Executive order, to consolidate and co-ordinate any hospitals and executive and administrative bureaus, agencies, or offices, especially created for or concerned in the administration of the laws relating to the relief and other benefits provided by law for former members of the Military and Naval Establishments of the United States, including the Bureau of Pensions, the National Home for Disabled Volunteer Soldiers, and the United States Veterans' Bureau into an establishment to be known as the 'Veterans' Administration', and to transfer the duties, powers, and functions now vested by law in the hospitals, bureaus, agencies, or offices so consolidated and co-ordinated, including the personnel thereof, and the whole or any part of the records and public property belonging thereto to the Veterans' Administration.

"(b) Under the direction of the President the Administrator of Veterans' affairs shall have the power, by order or regulation, to consolidate, eliminate, or redistribute the functions of the bureaus, agencies, offices, or activities in the Veterans' Administration and to create new ones therein, and, by rules and regulations not inconsistent with law, shall fix the functions thereof and the duties and powers of their respective executive heads. July 3, 1930, c. 863, § 1, 46 Stat. 1016."

Title 38 U.S.C.A. § 11a. "Administrator of Veterans' Affairs; appointment; salary, functions, powers, and duties

"There shall be at the head of the Veterans' Administration an administrator to be known as the Administrator

of Veterans' Affairs, who shall be appointed by the President, by and with the advice and consent of the Senate. Such administrator shall receive basic compensation at the rate of $17,500 per annum, payable monthly. Upon the establishment of such Veterans' Administration, all the functions, powers, and duties prior to July 3, 1930, conferred by law upon the Commissioner of Pensions, the Board of Managers of the National Home for Disabled Volunteer Soldiers, and the Director of the United States Veterans' Bureau are conferred upon and vested in the Administrator of Veterans' Affairs. Such administrator, under the direction of the President, shall have · the control, direction, and management of the various agencies and activities enumerated in and referred to in section 11 of this title, and shall be charged with all the administrative duties relating to the National Home for Disabled Volunteer Soldiers and the Bureau of Pensions imposed by law prior to July 3, 1930, upon the Secretary of the Army and the Secretary of the Interior, respectively. All final decisions or orders of any division, bureau, or board in the Veterans' Administration shall be subject to review, on appeal, by such administrator. July 3, 1930, c. 863, § 2, 46 Stat. 1016; July 26, 1947, c. 343, Title II, § 205(a), 61 Stat. 501; Oct. 15, 1949, c. 695, § 3, 63 Stat. 880."

2. Title 38, Code of Federal Regulations: "§ 17.35 General authority for emergency hospital treatment. (a) All potential beneficiaries having prima facie entitlement therefor, who are in need of emergency hospital treatment, may be provided therewith, and such emergency hospital treatment may, if necessary, be continued until a definite decision is reached as to the eligibility of

It appears that the regulations involved are permissive rather than man- datory. No employees of the defendant, apart from the Chief Attorney, Chief

the applicant for medical treatment. This authority for emergency hospitalization carries authority to supply Government transportation and necessary meals and lodging en route to the facility designated for the emergency admission."

Title 38, Code of Federal Regulations: "§ 17.45 Persons entitled to hospital *observation and physical examination.* Hospitalization for observation and physical (including mental) examination may be effected when requested by an authorized official, or when found necessary in examination of the following persons:

"(a) Claimants or beneficiaries of the Veterans' Administration, for purposes of disability compensation, pension, emergency officers' retirement pay, medical feasibility for vocational training under Public Law 16, 78th Congress, as amended, or Public Law 894, 81st Congress, as amended, and Government insurance."

Title 38, Code of Federal Regulations: "§ 14.230 Chief attorney not to file petition for inquisition in lunacy unless requested by veteran or relative, civil *official, etc.* The chief attorney will not file or cause to be filed a petition for an inquisition in lunacy for commitment or for the appointment of a guardian unless he has a written signed statement from the incompetent veteran's nearest relative or from the veteran himself. In the event there is no near relative and if the veteran is not mentally capable of authorizing such action, the chief attorney may file the petition if signed by a civil official or representative of a cooperating agency. No employee of the Veterans' Administration will sign such a petition unless authorized by the solicitor. The chief attorney will render the legal services in commitment cases when costs are authorized to be paid by the Veterans' Administration as provided in § 14.224. In guardianship cases the chief attorney will notify the veterans' nearest relative. The person selected as the proposed guardian, a civil official or a representative of a cooperating agency of the action that should be taken, and that the chief attorney will, if so requested, file the petition without cost if veteran is not entitled to sufficient benefits to justify employment of an attorney. Thereafter he will take no definite action relative to the filing of a petition unless and until such written request therefor is received."

Title 38, Code of Federal Regulations: . "§ 13.230 Chief Attorney not to file petition for inquisition in lunacy unless requested by veteran or relative, civil official, etc. The Chief Attorney will not file or cause to be filed a petition for an inquisition in lunacy for commitment or for the appointment of a guardian unless he has a written signed statement from the incompetent veteran's nearest relative or from the veteran himself. In the event there is no near relative and if the veteran is not mentally capable of authorizing such action, the Chief Attorney may file the petition if signed by a civil official or representative of a cooperating agency. With a view of safeguarding the welfare and interests of veterans and Veterans Administration personnel when medical authorities regard a nonhospitalized veteran as potentially . dangerous to himself or others and decide that hospitalization is advisable, if the chief medical officer, the director of clinic, or preferably the physician who examined the veteran, and the Chief Attorney agree that the veteran should be committed, and if the veteran refuses to accept hospitalization on a voluntary basis and efforts to have him committed fail because a petition will not be signed by the nearest relative, guardian, civil official, or representative of a cooperating agency, authorization is hereby conferred upon the chief medical officer, or the director of clinic, or their designees, if not prohibited by State law, to sign the complaint or petition for commitment, whichever is necessary to have the veteran legally apprehended by the civil authorities and hospitalized. In similar instances, where hospitalized veterans demand their release and are dangerous to themselves and to others and ᐟall the usual efforts to effect commitment have failed and the Director, Professional Services, and the Chief Attorney agree that commitment is necessary and feasible, authority is hereby conferred upon the Director, Professional Services, or his designee, to file a complaint or petition for commitment. The petition will not be signed by the Director, Professional Services, or his designee, when the State statutes provide that an insane person may not be committed on the petition of officials connected with such institutions; nor shall such petition be signed by such officials if the State law specifically provides that a petition for commitment may be signed

Medical Officer or his representative, the Chief Professional Services or Clinical Director of a Veterans Administration Hospital, have any authority to seek commitment. Authority to act does not ipso facto create a duty to act. Veterans' benefits are gratuities. Van Horne v. Hines, 1941, 74 App.D.C. 214, 122 F.2d 207, certiorari denied 314 U.S. 689, 62 S.Ct. 360, 86 L.Ed. 552. Merely because a veteran once served in the United States Armed Forces does not mean that the United States assumed the duty to protect the general public from those veterans who might become dangerous to society.

■ The plaintiffs in effect are contending that since Peakes once served in the United States Army, the Federal government should thereafter be responsible to the public for failure to commit him irrespective of the cause of his disability. The Federal government has no constitutional or inherent power to commit. Higgins v. United States, 9 Cir., 1953, 205 F.2d 650, certiorari denied 1953, Higgins v. Binns, 346 U.S. 870, 74 S.Ct. 134, 98 L.Ed. 379; Wells, by Gillig v. Attorney General, 10 Cir., 1953, 201 F.2d 556; Barry v. Hall, 1938, 68 App. D.C. 350, 98 F.2d 222. Indeed, no authority seems to exist whereby any government, Federal or State, or any individual has been held liable for *failure to commit*. Many cases have held hospitals responsible for acts of *patients* who had escaped custody or committed improper acts while in custody. See Jones v. The State of New York, 267 App.Div. 254, 45 N.Y.S.2d 404; Weihs v. State, 267 App.Div. 233, 45 N.Y.S.2d

542; Curley v. State, 148 Misc. 336, 265 N.Y.S. 762, affirmed sub nom Luke v. State, 253 App.Div. 783, 1 N.Y.S.2d 19; Panella v. United States, 2 Cir., 1954, 216 F.2d 622.

In Fair v. United States, 5 Cir., 1956, 234 F.2d 288, recovery was sought for the death of three persons shot by an Air Force officer *after* he had been *released* from an Air Force Hospital. The officer had previously threatened the life of one of the decedents. The other two persons had been hired to protect her. The Air Force physicians and the Provost Marshal, employees of the United States, knew of these threats. The Provost Marshal had promised that notification of any release of the officer would be given so that adequate precautions could be taken. However, no such notification was given. The judgment of the district court, dismissing the complaint for failure to state a claim upon which relief could be granted, was reversed and the case remanded for trial.

■ The fact that the United States assumes to give certain benefits to veterans, including educational assistance, medical treatment, and even hospitalization under certain circumstances, does not of itself involve an assumption of control over such veterans so as to give rise to a duty to protect the public from their acts.

■ The plaintiffs in substance charge the defendant with failure to have Peakes committed to an institution. There certainly is no evidence of negligence in discharging Peakes from service in 1945. The evidence negatives such a conclusion. No psychiatrist, medical of-

only by certain designated individuals which by its terms would exclude such officials. In all other cases in which commitment is deemed necessary in the interests of the veteran and the public, such a petition will not be signed by an employee of the Veterans Administration. The Chief Attorney will render the legal services in commitment cases when costs are authorized to be paid by the Veterans Administration as provided in § 13.224. In guardianship cases, the Chief Attorney will notify the veteran's

nearest relative, the person selected as the proposed guardian, a civil official, or a representative of a cooperating agency, of the action that should be taken, and that the Chief Attorney will, if so requested, file the petition without cost if the veteran is not entitled to sufficient benefits to justify employment of an attorney. Thereafter, he will take no definite action relative to the filing of a petition unless and until such written request therefor is received."

ficer, or anyone else determined at the time of discharge (or, in fact, at any other time) that Peakes was potentially dangerous and should be committed. The release of Peakes under such circumstances was not negligence. See St. George v. State, 1953, 203 Misc. 340, 118 N.Y.S.2d 596, reversed, 3rd Dept.1954, 283 App.Div. 245, 127 N.Y.S.2d 147, affirmed 1954, 308 N.Y. 681, 128 N.Y.S.2d 583. In the opinion of the Appellate Division in the aforementioned case, which reversed the trial court's decision for the plaintiff and which reversal was sustained without opinion by the Court of Appeals, Mr. Justice Coon wrote in part as follows:

"The diagnosis of mental cases is not an exact science. As yet the mind cannot be x-rayed like a bone fracture. Diagnosis with absolute precision and certainty is impossible. * * * The modern concept of handling cases of mental illness is treatment, not simply incarceration. The objective is to return the patient to society, which should be done as soon as, in the judgment of properly qualified doctors and psychiatrists, it is likely to be safe for others and helpful to the patient. * * *

" * * * Future human behavior is unpredictable, and it would place an unreasonable and unfair burden upon the State if it were to be held responsible in damages for everything that a person does after he has been discharged or released from one of its State institutions, even though the release was through an error of judgment, unless there is something more present than is contained in this record.

"There is no case in New York which has heretofore imposed liability under the circumstances presented here. To sustain this judgment would be to extend liability beyond any point heretofore reached, which we are unwilling to do. See Statini v. State of New York, 202 Misc. 689, 112 N.Y.S.2d 20. Other jurisdictions have not looked with favor upon cases of this type. Cf. Bollinger v. Rader, 151 N.C. 383, 66 S.E. 314; Emery v. Littlejohn, 83 Wash. 334, 145 P. 423; Cappel v. Pierson, 15 La.App. 524, 132 So. 391, and Kendrick v. United States, D.C., 82 F.Supp. 430.

"The 'escape' cases, such as Weihs v. State of New York, 267 App.Div. 233, 45 N.Y.S.2d 542, and Jones v. State of New York, 267 App.Div. 254, 45 N.Y.S.2d 404, and many others, are readily distinguishable. In those cases it was known that the patient was suffering from a type of insanity requiring confinement and should not be at large and might do harm. The negligence lay in permitting the escape.

\* \* \* \* \* \*

"To sustain this judgment would have a more far-reaching effect than the money damages. In its practical aspects it would mean that the State could release no one from any State mental institution without being under the risk of liability for whatever he did thereafter, and the result would necessarily be reluctance to release and the unnecessary confinement of persons who would benefit by release. Excelsior Ins. Co. of N. Y. v. State of New York, 296 N.Y. 40, 46, 69 N.E.2d 553. Tragic as the occurrence was, there is no legal basis for liability of the State." 283 App.Div. at pages 248–249, 127 N.Y. S.2d at pages 150.

The general doctrine of the St. George case, supra, has in effect been incorporated in the Federal Tort Claims Act. Section 2680(a), Title 28 U.S.C.A., provides certain exceptions to the jurisdiction conferred by the Federal Tort Claims Act. Insofar as is here pertinent, the section provides that there shall be excepted from the operation of the statute claims based upon "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an em-

ployee of the Government *whether or not the discretion involved be abused."*

█ The term "discretionary function" as used in Section 2680(a) has been defined as a function or duty which "necessarily requires the exercise of reason in the adaptation of means to an end, discretion as to how, when, or where an act shall be done, and the course to be pursued in the attainment of Congressional programs." Mid-Central Fish Co. v. United States, D.C.Mo., 1953, 112 F. Supp. 792, 798, affirmed National Mfg. Co. v. U. S., 8 Cir., 210 F.2d 263, certiorari denied 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108.

█ In this case the acts of the psychiatrists involved come within the scope of the term "discretionary function." They were retained to make professional diagnoses and if any error was committed it was an error in the exercise of their authorized discretion resulting from an improper diagnosis. Such conduct is clearly within the scope of the exception and clearly not actionable. Numerous cases have so held when considering the liability of hospitals where injuries have resulted from the exercise of medical judgment in the case of mental patients. Smart v. United States, 10 Cir., 1953, 207 F.2d 841; Denny v. United States, 5 Cir., 1949, 171 F.2d 365, certiorari denied 1949, 337 U.S. 919, 69 S.Ct. 1161, 93 L.Ed. 1728; Kendrick v. United States, D.C.Ala., 1949, 82 F.Supp. 430.

See also Kubas v. State, 1949, 198 Misc. 130, 96 N.Y.S.2d 408; Schwenck v. State, 1953, 205 Misc. 407, 129 N.Y.S. 2d 92; Excelsior Insurance Co. of New York v. State, 1946, 296 N.Y. 40, 69 N.E.2d 553; Flaherty v. State, 1947, 296 N.Y. 342, 73 N.E.2d 543.

The statute is also clear in its language in providing that the exception is to apply even where "the discretion involved be abused." As was stated by the court in Mid-Central Fish Co. v. United States, D.C.Mo., 1953, 112 F.Supp. 792, 798, affirmed National Mfg. Co. v. U. S., 210 F.2d 263, certiorari denied 347 U.S. 967,

74 S.Ct. 778, 98 L.Ed. 1108: "[I]t is not material whether the agency or the employee used reasonable care in ascertaining the facts on which such a judgment was founded, or whether they otherwise wrongfully abused the discretion * * *."

█ On the assumption that the complaint states a cause of action and that negligence of the defendant would be sufficient on which to predicate liability, it is my opinion that the plaintiffs have failed to establish such negligence. Dr. Theodore S. Weiss, a psychiatrist and neurologist, testified for the plaintiffs. After an examination of the hospital records, his opinion was that Peakes should have been "in custody." However, he said that by "custody" he meant some kind of treatment or supervision or voluntary or compulsory commitment. On being recalled later, and after examining a certain letter from Peakes, he stated that he would have recommended commitment. His opinion seemed to be that frustration of the veteran's electron contentions resulted in the physical violence leading to the homicide. No knowledge of Peakes' frustration as to this factor was brought home to the defendant.

On the other hand, Dr. George J. Weinsein, Chief of the Psychiatry and Neurology Divisions in one of the Veterans Administration areas, testified in opposition after reviewing Peakes' record. He pointed out that none of the medical officers recommended commitment and that no conduct of Peakes referred to in the file indicated such necessity.

Therefore, it is evident that even on the above assumptions of law, for the purpose of determining this phase of the problem, the plaintiffs have not sustained by a fair preponderance of the evidence the burden of showing negligence which resulted in the unfortunate death of their intestate.

I do not believe that the decision of the New York Court of Appeals in Bing v. Thunig, 1957, 2 N.Y.2d 656, 143 N.E.2d

3, which overruled the so-called "Schloendorff Rule," has any pertinence here.

I, therefore, make the following conclusions of law:

## Conclusions of Law

1. The court has jurisdiction of the parties and subject of this action.

2. The plaintiffs have not proved that the defendant was negligent under the facts and circumstances of this case.

3. The plaintiffs have not proved facts sufficient to constitute liability on the part of the defendant.

4. The defendant is entitled to judgment dismissing the complaint upon the merits with prejudice.