Larry ABERNATHY, as Special Administrator of the Estate of Scottie Abernathy, Deceased, Appellant,

v.

UNITED STATES of America and its Agencies, Department of Health and Human Services and Department of the Interior, United States of America, Appellee.

No. 84–1957.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1985.

Decided Sept. 9, 1985.

Rick Johnson, Gregory, S.D., for appellant.

Bonnie P. Ulrich, Asst. U.S. Atty., Sioux Falls, S.D., for appellee.

Before ROSS and BOWMAN, Circuit Judges, and OLIVER, Senior District Judge*.

BOWMAN, Circuit Judge.

On May 20, 1979, Scottie Abernathy was beaten to death by Thomas Voice with a baseball bat. Voice is an epileptic with organic brain syndrome who has been treated by the Indian Health Service and by the Bureau of Indian Affairs Department of Social Services, and who once was taken into custody by a Bureau of Indian Affairs policeman on charges of assault and battery. Larry Abernathy filed suit under the Federal Tort Claims Act on behalf of the estate of his son, Scottie Abernathy. The complaint alleged that because the United States had knowledge of Voice's violent nature it should have had him committed to a mental institution or should have prosecuted, convicted, and incarcerated him on the aforementioned charges of assault and battery, and that the government's negligent failure to do so was the proximate cause of Scottie Abernathy's death. After a bench trial, the District

* The HONORABLE JOHN W. OLIVER, Senior United States District Judge for the Western District of Missouri, sitting by designation.

Court[1] entered judgment in favor of the government. We affirm.

## I.

Voice was born on August 15, 1957. He began having seizures in 1963 and his epilepsy was diagnosed in 1965. Over the years, his behavior became less and less controllable. As a result, Voice was sent to the Nebraska Psychiatric Institute from July 31, 1969 to September 22, 1969 for psychiatric evaluation. During this period, with therapy and medication, Voice regained control over his behavior. Voice was diagnosed as having adolescent adjustment reaction, non-psychotic organic brain syndrome, and epilepsy. Medication was prescribed for Voice and was to be continued after he left the Institute.

The psychiatrist who treated Voice at the Institute recommended that Voice be placed in a structured environment such as the Pierre Indian Learning Center, a boarding school in Pierre, South Dakota operated by the Bureau of Indian Affairs. The psychiatrist further recommended that should Voice be unable to adjust to the boarding school environment, he should be placed in a psychiatric facility.

Following the psychiatrist's recommendation, Voice was placed in the Pierre Indian Learning Center upon leaving the Institute. After he attacked one student and threatened to rape others, his parents removed him from the school. Voice was referred to a psychologist, who recommended that he be returned to a psychiatric facility for institutional therapy. The only facility available to Voice at Indian Health Service expense was the Nebraska Psychiatric Institute in Omaha, Nebraska. Voice's parents did not want him to be in a facility so far away from their home in South Dakota. Since government funding was not available at any other facility and Voice's parents could not afford to put him in a closer facility, his parents took him out of school and brought him to the family home in Bad Nation, South Dakota.

Three physicians under contract with the Indian Health Service to provide health care to Indians prescribed medicine to control Voice's epilepsy and to provide him with more control over his day-to-day behavior from 1972 until the death of Scottie Abernathy. For undetermined reasons, however, Thorazine, a drug used to control violent or assaultive behavior in persons with organic brain syndrome, was discontinued in 1969.

Albert Marian, a physician's assistant in the Fort Thompson Indian Health Service Clinic, began seeing Voice at the clinic in 1976. Marian's primary service to Voice was to refill his prescriptions. In addition, Marian had laboratory tests conducted in connection with the prescriptions. The Fort Thompson clinic had access to a network of doctors throughout South Dakota when the advice of a specialist was needed. On several occasions, Marian called on these specialists to get advice on how to treat Voice.

During the course of his service to Voice, Marian arranged for Voice to see a neurologist, Dr. Koob, and to see Ron Goldsmith, a psychiatric social worker. Voice did not keep either of these appointments.

On two occasions in 1978, Voice suffered injuries during epileptic seizures and was admitted to a hospital in Chamberlain, South Dakota. Voice was not given psychiatric treatment during either of these admissions, even though he struck a nurse during his second stay.

Marian contacted Dr. Insburg, a Yankton, South Dakota neurologist in December 1978. Insburg suggested that Voice's epilepsy medicine be changed from Dilantin to Tegredol. From then on, Voice was treated with Phenobarbitol and Tegredol.

On January 11, 1979, Voice struck his sister, Geraldine McBride, with an axe handle. He also broke the windshield of her

---

1. The Honorable Andrew W. Bogue, Chief United States District Judge for the District of South Dakota.

car with the axe handle and assaulted, but did not hit, her husband.

McBride and her husband filed criminal complaints in tribal court against Voice in connection with the January 11 attack. Bureau of Indian Affairs Policeman Captain William Shields brought Voice in on the charges. After an investigation, the victims dropped the charges. The tribal judge asked the tribal prosecutor if he planned to bring commitment proceedings against Voice, and the prosecutor said he did not.

On February 27, 1979, Voice was referred by Winifred Boub of the Bureau of Indian Affairs Social Services to Robert Mills, a counselor for a private non-profit counselling agency. Mills recommended that Voice be committed to the Yankton Human Services Center, but he did not initiate commitment proceedings. On May 20, 1979, three months after the referral to Mills, Voice again became violent and beat Scottie Abernathy to death. Voice apparently became angry because he had been caught attempting to steal a pair of blue jeans from the store operated by Scottie Abernathy's father. Voice was tried and convicted of second degree murder.[2] This action by Scottie's father followed.

Scottie's father filed suit under the Federal Tort Claims Act on behalf of his son's estate alleging that the failure of the Indian Health Service and the Department of Social Services to have Voice committed to a mental institution or otherwise restrained proximately caused the death of Scottie. He also alleged that the failure of the Bureau of Indian Affairs to seek Voice's conviction or commitment following the assault on Geraldine McBride proximately caused Scottie's death. Following a bench trial the District Court held for the government.

## II.

The Federal Tort Claims Act (FTCA) is a limited waiver of sovereign immunity by the United States government which, with exceptions, provides a remedy in tort for persons injured by the negligence of government agents acting in the course and scope of their official duties. 28 U.S.C. § 2680. It directs that the law of the state in which the act or omission resulting in injury occurred be used to determine whether there is liability on the facts of the particular case. 28 U.S.C. § 1346(b).

Because the legal position advanced by the plaintiff has never been addressed in the South Dakota courts, the District Court had to determine what the South Dakota Supreme Court would have decided if faced with the same facts and legal question. *Commissioner v. Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967). The District Court began by noting the general proposition contained in the Restatement (Second) of Torts, recognized under South Dakota law, that there is no affirmative duty to control the conduct of a third person. *See* Restatement (Second) of Torts § 315(a); *see also Cuppy v. Bunch*, 88 S.D. 22, 214 N.W.2d 786, 788 (1974). The District Court observed, however, that Restatement § 315(a) states, and some jurisdictions have held, that a duty to control may exist if a special relationship exists between the actor and the third party, or between the actor and the victim of the third party's behavior. The District Court then looked to determine if any of the agencies of the federal government which rendered services to Voice had sufficient control over Voice to give rise to a special relationship. Quoting a similar California case, the court stated that, " 'in order to to take charge of a person in such a manner as will create a duty to control his conduct, one must posses the *ability* to control that person's conduct.' " *Abernathy v. United States*, No. 81–3017, slip. op. at 11 (D.S.D. July 5, 1984) (unpublished) (quoting *Megeff v. Doland*, 123 Cal.App.3d 251, 261, 176 Cal.Rptr. 467, 472 (Cal.Ct.App.1981)). Looking at the relationships between Voice and the Indian Health Service and between Voice and the Department of Social Services, the District Court concluded that nei-

---

**2.** At his trial, Voice unsuccessfully raised a defense of insanity.

ther of these agencies ever had the ability to control Voice's conduct. For example, Marian could not even get Voice to keep the medical and counseling appointments he had arranged for Voice.

With respect to the Department of Social Services, the District Court also concluded that, even if there was a duty on its part to commit Voice, any decision on commitment falls within the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a), and cannot serve as a basis for recovery. Similarly, the District Court found that any decision on the part of the Bureau of Indian Affairs police force not to commit or prosecute Voice at the time of his assault on Geraldine McBride was protected from liability by the discretionary function exception. Having found no basis under which Abernathy's estate could recover, the District Court entered judgment in favor of the government.

### III.

On appeal plaintiff's arguments are identical to his arguments before the District Court. We are asked to recognize a new species of tort liability which would impose liability on the government for its failure to commit an individual known to have engaged in several incidents of violent behavior, and who arguably could have been either committed to a mental institution or tried on criminal charges and convicted. Assuming *arguendo* that in some circumstances the law might impose such liability on a private actor, we agree with the District Court's holding that a decision by the government to seek or not to seek the commitment of a mentally ill person or whether to prosecute or not to prosecute a person on a criminal charge falls within the discretionary function exception of the FTCA. Moreover, and as an alternative ground of our decision, we find no support for plaintiff's theory of liability in the law of South Dakota. Accordingly, we affirm the judgment of the District Court.

### IV.

 Under the FTCA, acts performed by the United States which are discretion-

ary functions are immune from liability. 28 U.S.C. § 2680(a). Among the decisions protected by this exception are those made by a doctor requiring medical judgment. *See, e.g., Smart v. United States,* 207 F.2d 841 (10th Cir.1953). With respect to the commitment of mentally ill persons, *Fahey v. United States,* 153 F.Supp. 878, 885–86 (S.D.N.Y.1957), holds that the Veterans Administration's failure to commit a veteran who subsequently killed another person was protected by the discretionary function exception. We agree with the approach taken in *Fahey.* Any decision to seek to commit Voice would rest upon an exercise of judgment by the responsible government agency. *Id.* at 886. Such judgment necessarily entails discretion on the part of the health care professionals involved, and is protected by the discretionary function exception. Thus, even if the decision was negligent, the government could not be held liable for choosing not to seek the commitment of Voice.

 Similarly, the government's failure to prosecute Voice for the assault on Geraldine McBride is protected by the discretionary function exception. Although the federal government has a duty to enforce the law, the means by which it proceeds to do so are protected by the discretionary function exception to the FTCA. *See Redmond v. United States,* 518 F.2d 811, 816–17 (7th Cir.1975). *But see Wright v. United States,* 719 F.2d 1032, 1035 (9th Cir.1983) (conduct in implementing prosecutorial decision not immune from liability). Here, given the circumstances under which the assault occurred and the manner in which similar cases were handled, *see* Trial Transcript at 265–66, the prosecutor's decision not to prosecute was clearly a discretionary one and thus was not actionable under the FTCA.

We hold that the government is immunized from liability by the discretionary function exception to the FTCA for its decision not to prosecute or commit Voice. Accordingly, we affirm the judgment of the District Court.

## V.

As an alternative basis for our affirmance of the judgment below, we hold that plaintiff's theory of the case—that the government had a duty to control Voice and that its breach of that duty was the proximate cause of the death of Scottie Abernathy—is not supported by the applicable state law. As a general rule, each individual is responsible only for his own conduct. There is no common law duty to control the conduct of another. As the *Restatement (Second) of Torts* § 315 states: "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another ...." (*Cited with approval in Cuppy*, 214 N.W.2d at 788.)

The Restatement recognizes exceptions to the general rule when a special relationship exists between the person charged with control and the person causing the harm. For example, a parent may be under a duty to exercise reasonable care to prevent his child from harming others. *Restatement (Second) of Torts* § 316. While the relationship between the parent and child is relevant, the relationship by itself is insufficient to warrant imposition of such a duty, *Miller v. Stevens*, 63 S.D. 10, 256 N.W. 152, 154 (1934); rather, the duty rests on the parent's ability to control the actions of the child, *Megeff*, 176 Cal. Rptr. at 472. A mental hospital's ability to control the conduct of a patient in its custody with known propensities for violent behavior imposes upon it a duty to exercise care not to release the patient when he presents a danger to others. *Restatement (Second) of Torts* § 319; *Williams v. United States*, 450 F.Supp. 1040, 1044 (D.S.D. 1978); *Lipari v. Sears*, 497 F.Supp. 185, 191 (D.Neb.1980).

In both the parent/child and the institution/mental patient cases, the chief factors justifying imposition of liability are 1) the ability to control the person and 2) knowledge of the person's propensity for violence.[3] Thus, liability has been found where the defendant had the ability to control the actions of a person known to be violent. Plaintiff asks us to make a new addition to this category of cases by imposing vicarious liability on the federal government for the failure of its agents, none of whom were psychotherapists, to have Voice committed to a mental institution. None of the custodian/psychotherapist liability cases has extended liability as far as plaintiff would have us extend it in the present action. As the District Court noted, apart from Voice's brief confinement in connection with the assault on Geraldine McBride, *see* discussion *infra*, the federal government never had the ability to control Voice's actions. All the cases imposing a duty to prevent a third person from doing harm to the general public begin with either an undertaking of control, as in the case of a mental hospital with a violent patient, or a familial relationship, as in the case of a parent with a violent child. Here, the only confinement of Voice in a mental facility occurred ten years before the beating of Abernathy. At that time, although commitment was recommended if Voice proved unable to adjust at the Pierre Indian Learning Center, he was not diagnosed as a danger to society nor was he found to be psychotic: commitment was merely recommended as the best course to follow in light of Voice's problems. Boub testified that it was Voice's parents, not the Department of Social Services, who refused to have Voice committed after a psychologist recommended in 1970 that he be returned to the Nebraska Psychiatric Institute. Trial Transcript at 323–24. Neither the Indian Health Service nor the Department of So-

---

**3.** Another category of cases approaches the problem from the standpoint of the victim of the violent person. Some jurisdictions have charged a psychiatrist who knows that a patient intends to do harm to a specific person with the duty to exercise reasonable care to warn the patient's intended victim. *See, e.g., Tarasoff v. Regents of the University of California*, 17 Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976). This line of cases cannot apply in this case because it is undisputed that Voice had never met, much less threatened, Scottie Abernathy prior to Voice's entry into the Abernathy store on the day of the fatal assault.

cial Services undertook to control Voice during this period.

■ As for Robert Mills's later recommendation that Voice be treated as an inpatient, Mills's notes reveal that he told Voice of his intention to have Voice placed in a treatment center during the period immediately prior to Scottie's death. *See* Exhibit 11. Although Boub knew of this proposal by Mills, it appears that Mills had taken it upon himself to pursue this course of action. Mills's agency, Capitol Area Counseling, was a private organization and not a part of the federal government. Trial Transcript at 337. Boub's action in referring Voice to such a private agency did not create a corresponding duty to follow through on its recommendations. In short, Voice never was in the custody of the Indian Health Service or the Department of Social Services. Thus, the District Court was correct in holding that neither the Department of Social Services nor the Indian Health Service had sufficient control over Voice to warrant imposition of liability for Voice's actions.[4]

■ Nor can Captain Shields's handling of Voice's case in connection with his assault on his sister form a basis for liability. Shields had no authority to confine Voice longer than overnight pending a hearing in tribal court. Just as with the other government agents, his relationship with Voice did not rise to the level of a "special relationship" requiring him to take action to protect others from Voice's violent outbursts.

In fact, of all the government agents dealing with Voice, he probably had the least professional contact. Moreover, Shields was merely a police captain, not a prosecutor. The duty to prosecute Voice was with the tribal prosecutor who, after an investigation assisted by Shields, determined that the assault on Geraldine McBride was a family matter and did not warrant either commitment or criminal prosecution.

In short, Voice's relationships with these agencies and individuals were not of the kind required by the controlling legal principles in order to impose a duty to control Voice's conduct. Though we have the utmost sympathy for the family of Scottie Abernathy, to impose liability in this case would extend liability far beyond the limits that any American court or legislature has set. As stated in a similar context:

> [t]o impose upon those in counseling professions an ill-defined "duty to control" would require therapists to be ultimately responsible for the actions of their patients. Such a rule would closely approximate a strict liability standard of care, and therapists would be potentially liable for all harm inflicted by persons presently or formerly under psychiatric treatment. Human behavior is simply too unpredictable, and the field of psychotherapy presently too inexact, to so greatly expand the scope of therapists' liability.

*Brady v. Hopper*, 570 F.Supp. 1333, 1339 (D.Colo.1983). These arguments apply with even more force to cases such as this,

---

**4.** We hold that the government had no duty to commit Voice. We further note that even if the government had, in the exercise of its discretion, made a decision to seek the commitment of Voice, it would have had to proceed under the Crow Creek Tribal Code provisions governing commitment of the mentally ill. Exhibit 19. This code requires consideration of outpatient alternatives prior to hospitalization of a patient. Exhibit 19, § 17. The definition of mentally ill person under the tribal regulations states: " 'Mentally ill person' means an individual with an organic, mental, or emotional disorder which substantially impairs the capacity to use self-control, judgment, and discretion in the conduct of personal affairs and social relations." Exhibit 19, § 2. One of the government's expert witnesses at trial, a psychiatrist,

testified that Voice did not fit this definition, and thus could not have been committed. Moreover, the government's testifying neurologist stated that Voice had the ability to control his behavior and his violent temper was a learned behavior pattern and not the product of his organic brain syndrome or his epilepsy. Although some statements in the record portray Voice as an uncontrollably violent person, only four or five specific incidents of assaults or threats to people, occurring over a period of ten years, were established at trial. None of these incidents approached the severity of the assault on Scottie Abernathy. It is thus uncertain that Voice would have been found to be subject to commitment as a "mentally ill person" under the Tribal Code.

where less-trained medical and human services personnel are accused of failing to recognize or act upon a third party's mental condition.

## VI.

For the reasons set forth above, the judgment of the District Court is affirmed.