853 F.2d 927
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Alexa TOMASSETTI, Plaintiff,
Colleen Boeckmann, Plaintiff-Appellant (87-3640/3755),
Browning-Ferris Industries of Ohio, Inc.; Stephen F.
Marnell, Defendants-Third Party
Plaintiffs-Appellants (87-3639),
v.
UNITED STATES of America, Defendant-Third Party
Defendant-Appellee (87- 3639/3640/3755).
 
 Nos. 87-3639, 87-3640 and 87-3755.
 United States Court of Appeals, Sixth Circuit.
 Aug. 8, 1988.
 Before ENGEL, Chief Judge, and DAVID A. NELSON and RYAN, Circuit Judges.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 Early in the afternoon of Friday, the 13th of July, 1984, a 59-year-old hitchhiker named Dewey Denham walked or stumbled into the high speed lane of the interstate highway that runs from Cincinnati to Dayton, Ohio. The driver of an oncoming tractor trailer brought his rig to a halt in order to avoid hitting Mr. Denham. The tractor trailer was being followed by two passenger cars and a garbage truck. The cars stopped safely, but the garbage truck did not; it caused a chain collision that left one person dead and another seriously injured. The hitchhiker, Mr. Denham, was not hurt.
 
 
 2
 This appeal presents the question whether liability for the accident may be assigned to the United States by reason of its failure to keep Mr. Denham off the streets. Mr. Denham, a veteran of World War II, had been in and out of Veterans Administration hospitals for some years. His most recent hospitalization, a one-week stay at a VA institution in Dayton, had ended on July 6, 1984, only a week before the accident; at that time he had been discharged with a diagnosis of "dementia, secondary to alcoholism," and had been returned to a privately operated Cincinnati boarding home where he had lived for the past eighteen months or more. The hospital charts indicate that Mr. Denham's nephew, who took him back to the boarding home, was "aware" of Mr. Denham's condition, and the "homegoing instructions" recorded on the discharge summary say that Mr. Denham was "to stay in the boarding home under close supervision."
 
 
 3
 The supervision at the boarding home was not close enough to prevent Mr. Denham from hitchhiking back to Dayton from Cincinnati soon after his discharge from the hospital. Mr. Denham presented himself at the VA's medical center in Dayton on July 9, 1984, and requested admission to the center's domiciliary facility, or "Dom" as it is called. (Mr. Denham had stayed in the Dom prior to a lengthy hospitalization in 1981, but several subsequent requests for readmission had been refused because Mr. Denham's income exceeded the eligibility limit or because the domiciliary facility was not staffed to provide care for people who needed as much supervision as he did.) A VA social worker finally turned Mr. Denham away on July 11, after consultations with other staff personnel, doubtless expecting that he would hitchhike back to Cincinnati.
 
 
 4
 Mr. Denham did return to Cincinnati, where on July 12 he was examined at a VA medical facility for a complaint in his knee. He was presumably attempting to return to Dayton once again when the collision occurred on July 13th.
 
 
 5
 The accident resulted in the assertion of a number of claims against Browning-Ferris Industries, whose employee, Steven Marnell, was the operator of the garbage truck. Asking for contribution and/or indemnity, Browning-Ferris and Marnell filed a third-party complaint against the United States under the Federal Tort Claims Act. One of the injured parties, Colleen Boeckmann, filed a separate complaint against the United States under that Act. Both complaints were based on the theory that in discharging Mr. Denham from the hospital on July 6, and in failing to readmit him thereafter, the Veterans Administration had violated a duty of care owed to the public at large. This alleged breach of duty was claimed to make the United States liable for the damages that members of the public suffered as a result of the accident.
 
 
 6
 Applying Ohio law, as the Federal Tort Claims Act required him to do on the facts presented here, District Judge Arthur Spiegel entered summary judgment in favor of the United States. Under Ohio law, as Judge Spiegel concluded, a hospital may not be held liable for the negligent discharge of a patient unless the totality of the circumstances demonstrates that the hospital knew or should have known that the patient would be "very likely" to cause harm to himself or others upon his release. (The Ohio decision on which Judge Spiegel relied, Leverett v. State, 61 Ohio App.2d 35, 399 N.E.2d 106 (Franklin Co.1978), also declared that hospitals "are not generally under a legal duty to third parties as to decisions not to admit or readmit a patient." 399 N.E.2d at 110.) On the undisputed facts of the case before him, Judge Spiegel concluded as a matter of law that the Veterans Administration could not be charged with knowledge that the release of Mr. Denham was "very likely" to cause harm. An additional reason for granting the government's summary judgment motion, in Judge Spiegel's view, was that the injuries for which compensation was sought were accidental, rather than being the result of any intentional act of violence.
 
 
 7
 This is not an easy case. After a careful examination of the record, however, we find ourselves unable to say that the result reached by Judge Spiegel was wrong as a matter of Ohio law. The judgment in favor of the United States will therefore be affirmed.
 
 
 8
 * There is not much in Mr. Denham's story to suggest that his condition was greatly different on July 13, 1984, than it had been for some time before. Sadly, that condition is far from uncommon.
 
 
 9
 Mr. Denham, who was one of nine children in a rural Kentucky family, was born October 21, 1924. He entered the army in 1944, and seems to have been honorably discharged about a year later. He got married and had three daughters, but he was divorced in 1954 and evidently had little or no contact with his wife and children thereafter. His hospital records describe him as a loner.
 
 
 10
 He eventually moved from Kentucky to Dayton, Ohio, where his youngest sister lived. He worked at various times as an electrician and plumber, but the records say that he did not work after 1967. Somewhere along the line the VA awarded him a 20% service connected disability--"10% for neurosis and 10% [for] flat feet," according to one hospital chart--and he also began to receive disability payments from the Social Security Administration. He drank heavily, by his own account, sometimes consuming as much as a fifth of whiskey a day but sometimes drinking nothing for a month. A VA physician who examined him in 1972 described him as a chronic alcoholic.
 
 
 11
 On January 28, 1981, Mr. Denham was admitted to the VA medical center at Chillicothe, Ohio, on referral from the domiciliary at Dayton. Diagnosed as having "dementia, due to chronic alcoholism," he was assigned to an intermediate care building for evaluation and management. A psychiatrist found "minimal evidence of OBS [organic brain syndrome]," according to a discharge summary prepared in June of 1981, "but the patient was considered competent." The medical center attempted unsuccessfully to get him to go through an alcohol rehabilitation program.
 
 
 12
 In June of 1981 Mr. Denham left Chillicothe to take up residence in the Cincinnati area with his sister's son, Barry Hall, and the latter's wife Debbie. The Halls brought Mr. Denham back to Chillicothe for voluntary readmission the following month. Mr. Hall reported that although Mr. Denham had been sober for a year, "[h]e was belligerent and cursing his niece and had held a brick as if he were going to throw it at someone." He was "somewhat confused" on readmission to the hospital, his judgment and insight were impaired, and his memory was spotty.
 
 
 13
 Mr. Denham remained at the Chillicothe facility until December 4, 1981. He continued to be at least "slightly confused" and "quite aware of his memory deficit," forgetting where his room was, for example. He was irritable and uncooperative at times, and hostile to the ward nursing staff. The medical center judged him to be "competent and physically fit to resume pre-hospital level of activity," however, and in releasing him to live with his nephew, a staff physician noted that Mr. Denham "was not considered to be a risk to himself or others." There is no indication that his periodic hostility ever did culminate in injury to anyone, and he seems to have been "cooperative" most of the time.
 
 
 14
 In May of 1982 Mr. Denham sought readmission to the domiciliary facility in Dayton. Mr. Hall, the nephew, told the VA that "he doesn't have enough room in his home to continue to let the veteran live there," and Mr. Hall said that he would try to get Mr. Denham into a foster care home if he could not be admitted to the Dom. The social worker who interviewed Mr. Denham at this point did not have access to his medical records, but based on her own observations she thought he might do well in either placement.
 
 
 15
 Mr. Denham was not admitted to the Dom, apparently because his combined disability payments exceeded the income limits for such a facility. (See 38 C.F.R. Secs. 17.46 through 17.48.) He spent another few weeks in the Halls' home, but went back to Dayton in mid-June of 1982 and told a VA social worker that "the noise of the children bothers him and he wants another place." Mr. Hall then placed him in a nearby foster home, but as another VA social worker noted the following October, Mr. Denham "continued to leave." He normally got to his destination by hitchhiking. There was nothing remarkable about this; as one of the social workers testified, "we have a lot of hitchhikers."
 
 
 16
 Stating that there had been "no change in this veteran's condition" since May, the social worker who saw Mr. Denham in October of 1982 asked for reconsideration of the request for placement in the Dom. Mr. Denham was returned to his foster home before the screening committee for the Dom acted on the request for reconsideration, and VA social worker Alicia Howard noted that "it is highly unlikely that Mr. Denham would be accepted in the Dom, as he has a reputation for being disruptive." Ms. Howard went on to say that [h]e is in placement in his home area, and near relatives. In my opinion, this is best for him."
 
 
 17
 Social worker Howard saw Mr. Denham again in January of 1983, by which time he had been placed in a foster care home operated by a Mrs. Parm in Cincinnati. Mr. Denham hitchhiked back to Dayton in April and again in August of 1983, still seeking admission to the Dom, but Ms. Howard felt that his placement in Mrs. Parm's home was a "good" one. "He does not appear to be a good Dom candidate," Ms. Howard wrote, "as he tends to wander, and needs supervision."
 
 
 18
 Mr. Denham next presented himself in Dayton in February of 1984. He told Ms. Howard on this occasion that he was "fed up" with his foster home because "Mrs. Parm objected to his drinking and smoking" and "bossed him around all the time." (The supervision chez Parm seems to have been more than Mr. Denham cared for, in other words.) Ms. Howard thought Mr. Denham would create major problems if he should be admitted to the Dom, and she believed that he would get better supervision in a foster care home. The possibility of a new placement in Cincinnati was discussed with the Halls, and Ms. Howard's assistant volunteered to help them in finding a new place, according to Ms. Howard's deposition testimony. The Halls were said to have responded that "he was in a fine loving foster home and that they thought he should stay [where he was.]"
 
 
 19
 Mr. Denham turned up in Dayton again on June 29, 1984, and this time the medical center's admitting officer had him hospitalized for "behavioral observation" by the psychiatric service. The Chief of Inpatient Psychiatry at the hospital, a board-certified psychiatrist named Avijay Bapat, saw Mr. Denham on Monday, July 2, 1984. Working with a third-year medical student and a psychiatric social worker named David Drew, Dr. Bapat obtained a history of the patient and conducted a mental status examination. The examination revealed no indication of delusions or hallucinations, and showed that Mr. Denham knew who he was and where he was. He was "not oriented to time and situation," however, as Dr. Bapat testified, his memory was very limited, and he could not do simple calculations. A note countersigned by Dr. Bapat says, among other things, "[m]ental status exam showed significant impairment of both short and long term memory, with immediate recall being impaired also. Patient is oriented to place and person but not to time. Lacks insight and judgment as to his illness."
 
 
 20
 Mr. Denham had been placed in a "closed" (or locked) ward on admission, all of the beds in the open ward being filled, but he was privileged to leave the ward as he wished until sometime during the day on July 1. At that time he got into a shouting match with some other patients about switching channels on a television set, and the full privileges he had enjoyed before were discontinued. He was more cooperative thereafter, but still had periods of confusion in which he could not find his bed or the bathroom.
 
 
 21
 On his admission to the hospital Mr. Denham had been scheduled as a matter of routine to receive psychological testing. Dr. Bapat canceled the testing on July 5, 1984, the day before Mr. Denham was to be discharged. Having seen Mr. Denham every day since July 2, Dr. Bapat did not think that further testing was necessary to confirm his diagnosis, which was "dementia, secondary to alcoholism." It seems problematical whether additional tests would have told Dr. Bapat much that he did not know already.
 
 
 22
 Dr. Bapat testified at his deposition that Mr. Denham made no improvement in the hospital. When discharged on July 6, 1984, he was still disoriented and still had a problem with his memory. Dr. Bapat said that he did not think Mr. Denham needed any psychiatric or outpatient care. What he did need, according to Dr. Bapat, was "continued care in a structured environment, [where] he could be supervised and get three meals a day, but he did not require any acute medical attention or to stay in [a] psychiatric ward at that time."
 
 
 23
 Dr. Bapat instructed the psychiatric social worker, Mr. Drew, to tell whoever was going to take care of Mr. Denham to keep him under close supervision after his release. These instructions were memorialized in the discharge summary Dr. Bapat dictated on July 6.
 
 
 24
 A note on "discharge plans" written by social worker Drew on July 2 states that Mr. Drew had "contacted boarding home operator--they are saving his bed for him and want him to return." Mr. Drew also contacted the Halls and arranged to have Mr. Hall pick up Mr. Denham after work on Friday, July 6. The note comments that "Mr. Denham appears to have an appropriate boarding home to live in."
 
 
 25
 As far as we have been able to ascertain, neither the hospital records nor any of the depositions filed with the court disclose what Mr. Drew did in response to Dr. Bapat's instructions about telling Mr. Denham's "care givers" to keep him under close supervision. A nursing discharge summary prepared on July 6 does contain a brief entry in a section of the preprinted form calling for a statement as to the patient's and/or family's "understanding of illness and follow-up care;" the entry reads "family is aware." In a section of the form calling for "nurse's assessment of patient's health status"--a status of which the family was unquestionably "aware" --the nurse wrote "patient is not competent and is an escape risk."
 
 
 26
 Whether or not Mr. Denham's nephew or the operator of the foster care home in Cincinnati took any precautions to prevent Mr. Denham from "escaping" after his discharge from the hospital on July 6, escape he did. On July 9 he was found on the psychiatric ward where he had been hospitalized the week before. He was not readmitted as a patient, but was lodged overnight; one of the doctors referred him the next day to social worker Howard. She tried to reach Mr. Hall and Mrs. Parm, but was unsuccessful in doing so. She did talk with psychiatric social worker Drew, and she asked him if he thought Mr. Denham needed readmission in view of his wandering. Ms. Howard testified that Mr. Drew told her "no, the doctor did not think so." (Ms. Howard did not know whether Mr. Drew had in fact checked with the doctor.)
 
 
 27
 Because Mr. Denham needed a place to stay overnight on July 10, Ms. Howard sent him to the Gospel Mission, a temporary shelter where he had stayed several times in the past. He had no problem getting there himself, Ms. Howard testified.
 
 
 28
 On the following day, July 11, Mr. Denham was examined at the medical center by a Dr. Zyznomyrsky, who found nothing physically wrong with him. The doctor made notes on the back of his medical certificate reading "got from Cincinnati by thumb" and "no need to be admitted."
 
 
 29
 Ms. Howard was able to reach Mrs. Hall by telephone on the 11th. After talking with her, Ms. Howard prepared a consultation report containing this passage:
 
 
 30
 "Contact was made with his niece-in-law, Mrs. Debbie Hall. She states that the veteran has a very warm and caring foster home, where he is well cared for and well fed. The problem is that he decides to walk and keeps walking. Her husband has had to go as far as Columbia, Ky. (near Tenn.) to get him. The nephew's job is now in jeopardy because of time lost to retrieve Mr. Denham. She feels that he can find his way back to [Cincinnati] and suggests that he be escorted off center. 'Tell him to take I-75 South, rather than North, and give him the address of his foster home.'
 
 
 31
 A-O. It appears that Mr. Denham has exhausted the patience of his relatives, to the point where they are refusing to continue to indulge him. The nephew has been most willing to come for his uncle in the past, and seems to care very much for him. He always appears to be well-cared for upon first appearance at this VA. Perhaps, the niece is right, and the veteran needs a hard lesson in rejection to teach him to appreciate what he has in Cincinnati.
 
 
 32
 P-O. To counsel with the referring physician [Dr. Zyznomyrsky] and with Dr. Brown about the niece's suggestion. Veteran will be informed that the nephew will not come for him, and then will be asked to leave the center. He will be encouraged to return to Cincinnati."
 
 
 33
 When asked at her deposition what she did about getting Mr. Denham back to his "placement" in Cincinnati, Ms. Howard testified as follows:
 
 
 34
 "A. I attempted to get the Halls to come for him again. They could not.
 
 
 35
 Then, I attempted to arrange transportation via bus, as I had done before. We were out of social service funds and I could not get the money for transportation.
 
 
 36
 I could not get an escort because all the escorts were out in the field except one and they had to attend to patients. I could not make arrangements for transportation.
 
 
 37
 Q. So, what did you do then with him?
 
 
 38
 A. I went back to the referring physician and talked with him about that and went back to Dr. Brown, who is second in the area, and spoke with him about it and told him what the niece had told me, that she would not have her husband come up and that he should get back on his own."
 
 
 39
 Thereafter, Ms. Howard testified,
 
 
 40
 "... I referred him to the Gospel Mission, again, explained to him that they would not come and explained to him what Mrs. Hall said, that he should get himself back, that she was not coming for him.
 
 
 41
 Q. So, when he left you, he should have been going to the Gospel Mission?
 
 
 42
 A. To spend the night in the Gospel Mission, yes.
 
 
 43
 Q. And then, what were your plans for him after--
 
 
 44
 A. Well, the Gospel Mission have contacted the Halls, also, for Mr. Denham, and they have gone to the Gospel Mission to pick him up.
 
 
 45
 Q. To your knowledge, did they contact them on the 12th?
 
 
 46
 A. I do not know, I've had no further contact with the Gospel Mission in reference to Mr. Denham."
 
 
 47
 The record does not disclose whether Mr. Denham stayed in the Gospel Mission in Dayton on July 11, or how he got back to Cincinnati. There seems to be no question, however, that he was in Cincinnati on July 12, because a medical certificate prepared on that date by Dr. Thuss, a physician at the VA medical center in Cincinnati, says that Dr. Thuss saw him at 11:31 a.m. for a complaint of pain in the left knee. The knee was x-rayed at noon on July 12. That is the last we know of Mr. Denham's whereabouts until about 24 hours later, when he stepped out onto Interstate Highway 75, at a point a little north of Cincinnati, precipitating the tragic events that have already been described.
 
 
 48
 Mr. Denham was returned to the psychiatric ward of the Dayton medical center after the accident. The records describe his condition as "confused." Dr. Bapat testified that Mr. Denham appeared the same clinically as he had on July 6; he was cooperative and able to take care of himself, but he was disoriented and had a problem with memory. The accident having demonstrated that Mr. Denham was no longer able to hitchhike safely, Dr. Bapat concluded that he was "a danger to other people." On July 30, 1984, Mr. Denham was sent to the VA facility at Chillicothe for long term care, and a probate court ultimately entered an order committing him.
 
 
 49
 Browning-Ferris retained two expert witnesses, a psychiatrist and a psychologist, whose depositions were taken in connection with the third-party claim against the United States. The psychiatrist, Richard A. Ratner, M.D., testified that at the time of his release from the hospital on July 6, 1984, Mr. Denham represented a "substantial" risk of accidental harm to himself or others. The decision to release Mr. Denham on that date fell below the governing standard of care, Dr. Ratner testified, because the patient had not yet been adequately evaluated and because, in Dr. Ratner's opinion, he needed to be in a place where "there would be more supervision and more control than was available at the Parms' house, or I believe probably even at the Halls' house." Dr. Ratner testified that he himself would not have had Mr. Denham civilly committed before the accident.
 
 
 50
 The psychologist, Michael F. Hastings, Ph.D., faulted Dr. Bapat for discharging Mr. Denham without psychological testing. Even without such testing, however, Dr. Hastings rated Mr. Denham's dementia as "severe," in contrast to Dr. Bapat's "moderate" rating. (A psychological assessment made a year after the accident said that Mr. Denham's test profile "is characteristic of mild dementia.") Dr. Hasting's opined that Dr. Bapat "had to have known" that it would be "impossible" for Mr. Denham to stay in a boarding home under close supervision. Like Dr. Ratner, Dr. Hasting testified that Mr. Denham was not a suitable candidate for admission to the domiciliary facility.
 
 II
 
 51
 In its answer to Browning-Ferris' third-party complaint, the United States pleaded affirmatively that "[t]he Court lacks jurisdiction over the subject matter of this action because the action is in effect a suit against the United States to which the United States has not consented." Although the United States has consented to be sued for damages occasioned by the negligent acts or omissions of government employees, "under circumstances where the United States, if a private person, would be liable to a claimant in accordance with the law of the place where the act or omission occurred," 28 U.S.C. Sec. 1346(b), this waiver of sovereign immunity is subject to certain exceptions. Among them is the "discretionary function" exception set forth in 28 U.S.C. Sec. 2680(a). Under that statute the government's consent to be sued in tort does not extend to "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."
 
 
 52
 Relying on Abernathy v. United States, 773 F.2d 184 (8th Cir.1985), the United States argues on appeal that a negligence action based on breach of a supposed duty to institutionalize a mental patient is barred by the discretionary function exception to the Federal Tort Claims Act. In Abernathy the Court of Appeals for the Eighth Circuit declared that the exercise of judgment that must be undertaken in deciding whether to commit a person to an institution "necessarily entails discretion on the part of the health care professionals involved, and is protected by the discretionary function exception." 773 F.2d at 188. "Thus," the court continued, "even if the decision was negligent, the government could not be held liable for choosing not to seek the commitment...." Id. The Abernathy court allied itself, in so holding, with Fahey v. United States, 153 F.Supp. 878 (S.D.N.Y.1957) and Smart v. United States, 207 F.2d 841 (10th Cir.1953).
 
 
 53
 In Jablonski v. United States, 712 F.2d 391 (9th Cir.1983), on the other hand, the Court of Appeals for the Ninth Circuit held that the discretionary function exception did not bar a suit against the United States for negligence in (a) failing to obtain prior medical records on a potentially homicidal patient and (b) failing to warn a potential victim, where the victim was killed by the patient soon after two VA psychiatrists had seen the latter as an outpatient and decided that there was no basis for involuntary hospitalization. The Jablonski court characterized the acts and omissions of the VA psychiatrists as "operational acts, not discretionary acts involving planning." The court expressed disapproval of Smart v. United States, 207 F.2d 841, supra, "in which the Tenth Circuit held that a suit alleging injury resulting from the negligent release of a mental patient from a government hospital was barred by the discretionary function exemption." 712 F.2d at 396.
 
 
 54
 Speaking in the context of an allegedly negligent release of a patient from a state medical hospital, the Ohio Court of Appeals stated in the Leverett case, 399 N.E.2d 106, 110, that the uncertainties inherent in analyzing and treating the human mind render the decisions made by skilled doctors on such questions "highly discretionary." This is a proposition with which it is hard to quarrel, but it may not necessarily follow that the discretion exercised by Dr. Bapat in releasing Mr. Denham came within the discretionary function exception of the Federal Tort Claims Act. That exception "does not apply if the acts complained of do not involve the permissible exercise of policy discretion." Berkovitz v. United States, --- U.S. ---, 100 L.Ed.2d 531, 547 (1988). See also Collazo v. United States, --- F.2d --- (1st Cir.1988). Whether there was room for Dr. Bapat to exercise "policy judgment" in deciding to release Mr. Denham to a private boarding home is a question on which the existing case law is not as illuminating as we might wish it to be.
 
 
 55
 The district court was not called upon to wrestle with the discretionary function question, and the government has not pressed the point strongly here. We shall not undertake to decide the issue now. We do note, however, that some of the considerations that presumably prompted Congress to create the discretionary function exception are probably not unrelated to the considerations that have led the Ohio courts to adopt the rule that a hospital may not be held liable for the release of a mental patient, even where the release is negligent, unless the hospital knew or should have known that the patient would be "very likely" to cause harm on release.
 
 III
 
 56
 In granting the government's motion for summary judgment in this case, the district court dealt only obliquely with the contention that liability could be predicated on the VA's failure to readmit Mr. Denham after his discharge from the hospital on July 6. In Leverett, as the district court noted, the Ohio Court of Appeals said that "circumstances surrounding a readmission of a patient are substantially different from those surrounding releases." 399 N.E.2d at 110. The Ohio court went on to say that "[t]he dissimilarities of circumstances and pragmatic effect convinces us that mental hospitals and doctors are not generally under a legal duty to third parties as to decisions not to admit or readmit a patient." Id. The district court evidently thought that this language made it unlikely that the Ohio courts would have entertained a claim based on the failure to readmit Mr. Denham on July 10 or 11.
 
 
 57
 That may well be so, but we must acknowledge that the difference in circumstances alluded to by the Ohio court lies in the fact that "[i]n most instances, the doctor or hospital has only the assessment of lay people as to the condition of the 'patient,' as opposed to the opinions of medical experts after admitting, observing, and examining the patient." 399 N.E.2d at 110. It is possible, if not likely, that the Ohio courts would refuse to differentiate between a decision not to readmit and a decision to discharge under circumstances where the doctor or hospital had the benefit of "the opinions of medical experts after admitting, observing, and examining the patient." Arguably, at least, the case at bar presents just such an atypical situation.
 
 
 58
 In deciding to let Mr. Denham get back to Cincinnati by thumb, moreover, as opposed to arranging for a supervised return, the VA did something that Dr. Bapat himself found it difficult to defend. Mr. Denham did in fact make it to Cincinnati safely, however, which brings us back to the question whether the failure to readmit could have been actionable.
 
 
 59
 In this connection it is worth mentioning that neither Mr. Denham nor his nephew asked that Mr. Denham be hospitalized. What Mr. Denham wanted, rather, was to take up residence in the domiciliary facility--and everyone who expressed an informed opinion on the matter agreed that the Dom would not be suitable place for him because of the lack of supervision there. Nor was the hospital itself intended to be a place of residence. The VA hospital in Dayton is an acute care facility, not a nursing home. The truth is that Mr. Denham does not seem to have been in need of acute care. What he needed, rather, was close supervision--and the real question, it seems to us, is whether Mr. Denham should have been sent back to the VA facility at Chillicothe, where he had received custodial care for most of 1981, rather than being sent back to Mrs. Parm's foster home in Cincinnati.
 
 
 60
 If it was permissible for the VA to opt in favor of the Cincinnati home on July 6, we do not think it was impermissible for the VA to make the same election on July 11. It is true that Mr. Denham had eloped from Cincinnati in the interim, but he had done that in the past without adverse consequences, and there is no indication in the record that Mr. Denham's condition had changed materially between July 6 and July 11. That being so, whatever the Ohio law on readmission may be under factual circumstances such as those presented here, it does not seem to us that the failure to readmit Mr. Denham on July 11 would be actionable unless the July 6 decision to release him to the foster home in Cincinnati was actionable as well. Counsel for Browning-Ferris indicated at oral argument that it is the July 6 decision that is critical, and we agree.
 
 
 61
 In evaluating that decision we have the benefit of hindsight, of course, just as Dr. Bapat did after the accident. But the Leverett decision teaches that a court's assessment of the likelihood of harm from a hospital patient's being released "must ... not [be] based on hindsight." 399 N.E.2d at 110. What counts is what the decisionmaker knew or should have known beforehand--and from that vantage point, given the uncertainties inherent in analyzing the human mind, the "highly discretionary" hospital discharge decisions of "skilled doctors" (and Dr. Bapat was board certified, it will be recalled) are "subject to rebuke only for the most flagrant, capricious, and arbitrary abuse." Id.
 
 
 62
 Such an abuse could occur if the hospital authorities released a mental patient knowing ahead of time that the patient would be very likely to attempt suicide, for example, or would be very likely to inflict intentional harm on either a randomly selected victim (as in Leverett ) or on some readily identifiable victim, as in Littleton v. Good Samaritan Hospital, Nos. 9872 and 9886, Ct. of App.Montgomery Co.Ohio, May 28, 1987 (unpublished). (In the latter case a psychotic mother announced that she was planning to kill her newborn baby and ultimately did so.) But even where a decision to release a mental patient is negligent--as it would be, under familiar tort concepts, where a preponderance of the evidence indicated that physical harm would be the foreseeable result--Leverett teaches that liability may nonetheless be imposed "only" if the officials making the decision knew or should have known that harm was "very" likely to result. 399 N.E.2d at 110. This is obviously a higher standard than that applicable in the ordinary negligence case--and we note that the Franklin County Court of Appeal's most recent decision in the Leverett litigation (an unpublished decision rendered on June 21, 1984, by a panel that included Judge Alan Norris, now a member of our court) affirmed a judgment that the Ohio Court of Claims rendered in favor of the defendant under the stringent "very likely" standard.
 
 
 63
 Whether or not liability for negligent release may ever be imposed, under Ohio law, where the harm resulting from the release is accidental rather than purposeful, it is not to be supposed that the Ohio courts would apply a less stringent standard in an accidental harm case than in a purposeful harm case. If a peripatetic Mr. Denham was simply an accident waiting to happen, he had plenty of company. The country could doubtless be made safer for the mentally unimpaired if society were prepared to assume the burden of institutionalizing every mentally impaired person deemed likely to cause an accident at some point, but obviously we have not done that. In recent years, on the contrary, our emphasis has been on minimizing the restrictions placed on people suffering from mental impairments. When paranoid schizophrenics such as the patient who killed the plaintiff's decedent in Leverett are released from Ohio mental hospitals pursuant to the hospitals' statutory duty to place patients in the "least restrictive environment," it is hard to believe that an Ohio court would let an Ohio hospital be held liable for accidental harm attributed to the release of a Dewey Denham to a foster care home, absent a showing that the release would be "very" likely to cause the harm.
 
 
 64
 We cannot quarrel with Judge Spiegel's determination that no such showing could be made in the case at bar. Ignoring the question of intervening negligence on the part of the Halls or Mrs. Parm (an issue not developed on this record), and pretermitting the negligence of the garbage truck driver, who apparently had the last clear chance to avoid the accident, we think the most that the VA could have foreseen was the possibility of further unauthorized hitchhiking. If past is prologue, we cannot say that the district court erred in concluding that it was not "very likely" that the hitchhiking would have fatal consequences.
 
 
 65
 The judgment of the district court is AFFIRMED.